**SOUTHWIRE COMPANY, Appellant,**

v.

**UNITED STATES INTERNATIONAL TRADE COMMISSION, Fried, Krupp, GmbH, Krupp International, American Telephone and Telegraph Co., Western Electric Co., Inc. et al., Appellees.**

**Appeal Nos. 79–25, 79–31.**

United States Court of Customs and Patent Appeals.

Sept. 11, 1980.

Herbert Cohen, Victor M. Wigman, George C. Myers, Jr., Wigman & Cohen, Arlington, Va., James H. Bratton, Jr., Frederick G. Boynton, Gambrell, Russell & Forbes, Thomas W. Rhodes, Jane K. Wilcox, Atlanta, Ga., for Southwire.

Jeffrey S. Neeley, Advisory Atty., Scott Daniels, International Trade Commission, Washington, D. C., for International Trade Commission.

Edward Dreyfuss, Bernard Zucker, Western Elec., New York City, Edwin B. Cave, New Providence, N. J., for Western Elec., AT&T, Nassau Recycle Corp.

Harvey Kaye, George Spencer, Sheldon I. Landsman, Spencer & Kaye, Washington, D. C., Peter Stahlmann, Krupp Intern., Harrison, N. Y., Michael A. Hertzberg, Spencer & Kaye, Washington, D. C., for Krupp Intern. et al.

Before MARKEY, Chief Judge, BALDWIN and MILLER, Judges, SMITH, Judge,* and RE, Judge.**

---

* The Honorable Edward S. Smith, Judge, U.S. Court of Claims, sitting by designation.

** The Honorable Edward D. Re, Chief Judge, U.S. Customs Court, sitting by designation.

MARKEY, Chief Judge.

Southwire Company (Southwire) appeals from two decisions of the United States International Trade Commission (ITC) terminating portions of Investigation No. 337–TA–52, *In re Certain Apparatus for the Continuous Production of Copper Rod.* The investigation concerned alleged infringement of several Southwire patents by American Telephone and Telegraph Company (ATT) and its subsidiaries Western Electric Company (Western) and Nassau Recycle Corporation (Nassau). We affirm.

### Background

In 1949, the government instituted an antitrust suit against Western and ATT. In 1956, the suit was resolved by entry of a consent decree enjoining Western and ATT from (1) acquiring, directly or indirectly, title to any patent owned or controlled by any entity other than a company of the Bell System or its employees, and (2) receiving any right to grant sublicenses under patents except to associated companies. The decree permitted Western and ATT to accept patent licenses that granted the right to make, have made, use, lease and sell certain equipment.

On August 22, 1962, Western and Southwire entered into a joint development contract. Their objective was to develop to Western's satisfaction a continuous casting and hot rolling system (SCR system) for copper rod, the system being operable at a rate of not less than ten tons per hour. Western planned to use the system at Nassau's facility on Staten Island, New York, and hoped that it would be capable of processing all of its existing copper scrap and all of its copper scrap for the following ten years.

Western and Southwire agreed that each would purchase and own title to an undivided one–half interest in equipment used in the development program and that Western would have the option of purchasing Southwire's one–half interest. Both companies

were to provide at least two engineers for the program and were to share costs. The development work was to be carried out at Southwire's Carrollton, Georgia plant.

In the development contract, each party granted to the other royalty–free non–exclusive licenses under patents on inventions made during the contract period.[1] Those licenses allowed both companies to make, have made, use, lease and sell the patented inventions. Both companies were also given the right to grant sublicenses to associated companies.

The development contract further provided that one year after the end of the contract period, both companies would have the unrestricted right to reproduce, use, have used, disclose or dispose of all information originated by the parties under the contract, and all reports, specifications, drawings, data or other technical information required to be furnished by Southwire under the contract.

The joint development contract terminated on August 30, 1963. On September 17, 1963, Western exercised its option to purchase Southwire's interest in the development equipment. On January 28, 1964, Western and Southwire amended the development contract to provide that Western would receive Southwire's new SCR casting and rolling machines instead of those used during the development program and that Southwire would deliver the new system to Nassau's Staten Island facility. Southwire delivered the system to Staten Island in 1964 and it has been in continuous use there since that time.

On July 31, 1964, Southwire and Western entered into a formal license agreement, effective September 1, 1963. The agreement was intended to be a means of continuing work on the development program. Each party granted to the other royalty–free non–exclusive licenses under patents on inventions made during designated time periods. Those licenses permitted both

---

[1] The contract period is defined in Article II, Section 3 of the contract to be from August 22, 1962 to August 30, 1963.

companies to make, have made, use, lease, and sell the patented inventions. Both companies were also given the right to grant sublicenses to associated companies.

A number of patents were granted on inventions covered by the 1962 development contract and the 1963 license agreement, including U.S. Patent Numbers 3,317,994 ('994 patent), 3,672,430 ('430 patent), 3,716,-423 ('423 patent) and 4,129,170 ('170 patent).

In 1972, Southwire sold a second SCR system to Western for installation at its Hawthorne plant in Chicago, Illinois. In conjunction with the sale, Southwire entered into a User's License Agreement granting Western certain rights with respect to inventions made by Southwire prior to the start–up of that system. The agreement further indicated that the 1963 license agreement had already licensed Western under the '994, '430 and '423 patents. Several Southwire employees later visited the Hawthorne plant, seeking to inspect and copy documents specified in the 1962 joint development contract. Western refused to supply the requested documents. Southwire attempted to obtain those and other documents for more than a year after its initial request but Western continued to refuse.

In 1976, Southwire offered Western another SCR system for installation at Nassau's Gaston, South Carolina facility. The offer included a royalty–free license.[2] In a September 3, 1976 letter, a Southwire officer told a Nassau officer that the 1963 license agreement already licensed Nassau under the '994, '430 and '423 patents. On November 16, 1976, Southwire's president told the same Nassau officer that the 1962 development contract, the 1963 license agreement, and the 1972 User's License Agreement already licensed Nassau for some of the SCR equipment but that those agreements gave Nassau no right to use at Gaston equipment patented by Southwire

after the termination date of the 1963 license agreement. Western refused Southwire's offer and purchased a comparable system from Fried. Krupp GmbH and Krupp International, Inc. (collectively, "Krupp").

On April 11, 1978, Southwire filed a complaint with the ITC against Western, ATT and Nassau (collectively "Bell") and Krupp alleging unfair trace practices under section 337 of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1337 (section 337).[3] Southwire charged Krupp and Bell with infringing the '994, '430, and '423 patents and with misappropriating Southwire's trade secrets.

On September 26, 1978, Bell moved (Motion 52–41) to terminate the investigation with respect to the '994, '430 and '423 patents insofar as they related to Bell and to Krupp's activities at Gaston. The basis for the motion was that the 1962 development contract and the 1963 license agreement licensed Bell under those patents for the Gaston facility and that Krupp's activities respecting that facility fell within Bell's "have made" license rights.

Southwire opposed Motion 52–41, arguing that the existence of genuine issues of material fact precluded summary determination of whether Bell was licensed for the Gaston facility. In Southwire's view, Bell's licenses extended only to its plant at Staten Island. Southwire also argued that enforcement of Bell's license defense would violate the antitrust consent decree because it would effectively give Bell title to Southwire's patents and would sanction Bell's illegal sub–licensing of Krupp.

The hearing in the investigation began on March 28, 1979.

On March 29, 1979, the ITC granted Motion 52–41, having treated it as a motion for summary determination, and terminated that part of the investigation involving al-

---

**2.** A royalty was included in the equipment price.

**3.** 19 U.S.C. § 1337 reads, in part:

Unfair methods of competition and unfair acts in the importation of articles into the

United States . . . the effect or tendency of which is to destroy or substantially injure an industry . . . in the United States . . . are declared unlawful . . . . .

leged infringement of the '994, '430 and '423 patents by Bell and that part of the investigation involving alleged infringement of the '994, '430 and '423 patents by Krupp's manufacture and importation of the system at Gaston. Southwire appealed on May 29, 1979 (Appeal No. 79–25).

On November 3, 1978, Southwire moved the ITC to amend its complaint to include a charge of infringement of the '170 patent. The ITC granted the motion on January 31, 1979. On April 6, 1979, Bell moved (Motion 52–250) to terminate the investigation with respect to the '170 patent, insofar as it related to Bell and to Krupp's activities at Gaston. That motion was also based on the licensing provisions of the joint 1962 development contract and the 1963 license agreement.

Southwire opposed that motion, repeating arguments it made in opposing Motion 52–41. In addition, Southwire argued that Western's refusal to give Southwire development program documents was a violation of the development contract which should equitably estop Bell from using the licensing provision of that contract as an affirmative defense here. Southwire also argued that the motion was not a motion for termination but was in truth a motion for summary determination and that as such it was not timely filed.

On June 20, 1979, the ITC granted Motion 52–250, having treated it as a motion for summary determination, and terminated that part of the investigation involving infringement of the '170 patent by Bell and by Krupp's manufacture and importation of the system at Gaston. Southwire appealed on August 16, 1979 (Appeal No. 79–31). We consolidated Appeal Numbers 79–25 and 79–31.

### Issues

The issues are (1) whether Bell was licensed for its facility at Gaston, (2) whether Bell's licenses were illegal under the antitrust consent decree, (3) whether Bell is equitably estopped from using its licenses as an affirmative defense and (4) whether Bell's Motion 52–250 was timely filed.[4]

### OPINION

#### I. License for Gaston

Southwire argues that there are genuine issues of material fact respecting the scope of Bell's licenses and that summary determination that Bell was licensed for the Gaston facility is thus precluded, maintaining that those licenses extend only to the one system located at Staten Island. We disagree.

Bell's licenses under the Southwire patents, set out in two Western–Southwire agreements, i. e., the 1962 joint development contract and the 1963 license agreement, are clear and unambiguous. Their interpretation thus involves no issue of material fact.

■ Article II, section 1 of the 1962 contract and Article I, section 1 of the 1963 agreement license each party for "continuous metal casting systems." On their face those documents grant licenses for an indeterminate number of "systems." Southwire attempts to rewrite the agreements in an effort to demonstrate that "systems" (plural) meant "system" (singular) in context. In Southwire's view, "systems" (plural) was used in the agreements merely as a convenient and grammatically correct way of indicating, in one sentence, that each party was to receive a license for one system. Southwire cannot be permitted now to rewrite the agreements to support its view. "Systems" (plural) was the contract term used in the license granting clause. "System" (singular) was elsewhere expressly and specifically defined in the agreements [5] (Article IX of the 1962 agreement and Article VII of the 1963 agreement). Use of the

---

4. Bell argued in its brief that Appeal No. 79 31 should be dismissed because it was moot. Bell withdrew that contention, however, at oral argument. We express no view respecting the mootness of Appeal No. 79–31.

5. "Continuous metal casting system" means any aggregate of instrumentalities of a design primarily adapted for continuously casting metal rod. . . .

plural term "systems" in the license–granting clauses of the agreements thus demonstrates that the parties intended to license each other for more than one system.

Moreover, Article I, section 7 of the 1963 agreement gave Western the right to grant sublicenses to "its associated companies." The 1963 agreement was entered into on July 31, 1964, more than six months after Southwire agreed to deliver Western's first SCR system to its Nassau subsidiary at Staten Island. The Article I, section 7 right to sublicense associated companies would be superfluous unless the parties anticipated and intended that Western would construct systems at other locations as well.

The parties' intent to grant licenses for a number of systems is further demonstrated by the July 31, 1964 modification of the 1963 agreement. Western and Southwire agreed that Western's right to *sell* continuous casting "systems" which Western possessed by virtue of its right to "make, have made, use, lease, and sell" would be limited to the sale of only "surplus" systems. That modification was necessary only if Bell was licensed under the original agreement for more than one system.

Southwire's actions were consistent with Bell's having been licensed for multiple systems. The 1972 User's *License Agreement* between Southwire and Western and Southwire's proposed User License for the Gaston facility acknowledged that Bell was already licensed for those facilities under the 1963 license agreement. The November 16, 1976 communication between Southwire's president and Nassau stated:

> [Southwire] quoted you a system without regard to royalties notwithstanding the fact that some of the know–how, technology, and equipment design are not covered by virtue of our original development agreement nor by the second sale of an SCR system to your organization for installation at Hawthorne Plant, Chicago, Illinois. * * *
>
> We feel it our duty in consideration . . of our very long standing relations to advise you that Southwire has an issue of patents with Krupp/Hazelett which

would apply to your Gaston works insofar as it incorporates inventions patented by Southwire subsequent to September 1, 1968.

The communication is an admission that Bell was licensed under the 1962 and 1963 contracts and that those licenses could be used by Nassau at Gaston. The reference to September 1, 1968 relates to the termination date of the 1963 license agreement. The communication thus indicates that because of the existence of the 1963 license to Bell for Gaston, the patent dispute with Krupp only involved patents on inventions arising subsequent to September 1, 1968.

Southwire relies on Section 6 of Article I of the 1963 agreement which limits Western's licenses as follows:

> Such licenses do not extend
>
> (i) to any combination of any two or more of such equipments, or
>
> (ii) to any combination comprising one or more of such equipments and any other instrumentality,
>
> under any patent of the grantor of said licenses which is applicable to such combination otherwise than solely by being applicable to one or more of such equipments separately.

Contrary to Southwire's arguments, that section does not limit Western's use of a continuous metal casting system to a single location, *i. e.*, Staten Island.

"Equipment" is the contractual shorthand term for "continuous metal casting system." (Article I, section 1) The "Combination" of two or more continuous metal casting systems referred to in Article I, Section 6(i) necessarily relates only to systems that work in cooperation with each other. It would contort the common meaning of "combination" to construe it as covering systems that work independently at separate locations.

"Continuous metal casting system" is defined by Article VII, section 1 of the 1963 agreement as an "aggregate of instrumentalities of a design primarily adapted for continuously casting metal rod." The Section 6(ii) phrase "any other instrumentali-

ty" must therefore refer to instrumentalities not primarily designed for continuously casting metal rod. That section thus relates only to a combination of a continuous metal casting system and an instrumentality not primarily designed for continuously casting metal rod. A continuous metal casting system at one location and the same kind of system in another location would not be a "combination" within the meaning of Article 1, Section 6 (ii).

Southwire also relies on parol evidence in an attempt to prove that neither party *contemplated* more than one system at the time they entered into the licensing agreements and that it would have been economically disastrous for Southwire to license Bell for more than one system. That evidence conflicts with the clear and unambiguous language of the 1962 joint development contract and 1963 license agreement and is therefore of no benefit to Southwire.

Construction of both the 1962 development contract and the 1963 license agreement, according to their terms, is governed by the law of New York, where "The intention of the parties is found in the language used to express such intention." *Nau v. Vulcan Rail and Const. Co.*, 286 N.Y. 188, 197–99, 36 N.E.2d 106, 111 (1941), and "the words [of a contract] are always the most important evidence of the parties' intention." *Eddy v. Prudence Bonds Corp.*, 165 F.2d 157, 161–62 (2d Cir. 1947), *cert. denied*, 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948). The expressed contractual intent of the parties being clear, it must be upheld. Accordingly, we hold that Bell was licensed to acquire and operate its Gaston facility.

## II. Consent Decree

■ Southwire contends that Bell's licenses violated certain prohibitions of the 1956 consent decree. We disagree.

Article XII of the decree prohibits Bell from directly or indirectly acquiring "title" to patents of any person other than associated companies and employees thereof. Crucial indicia of title being absent, the nonexclusive license acquired by Western was not tantamount to "title." The licenses gave Western only the right to make, have made, use, lease and sell the patented inventions and the right to sub–license associated companies. Southwire, however, retained the exclusive right to license others and, most importantly, retained the exclusive right to sue infringers. The Supreme Court has stated:

> The owner of a patent may assign it to another and convey, (1) the exclusive right to make, use and vend the invention throughout the United States, or, (2) an undivided part or share of that exclusive right, or (3) the exclusive right under the patent within and through a specific part of the United States. But any assignment or transfer short of one of these is a license, giving the licensee no title in the patent and no right to sue at law in his own name for an infringement.

*United States v. General Electric Co.*, 272 U.S. 476, 489, 47 S.Ct. 192, 196, 71 L.Ed. 362 (1926). Bell thus did not receive "title" to Southwire's patents in contravention of the consent decree.

■ Section X(G)(3) of the consent decree prohibits Bell from "granting or receiving any right to grant sublicenses under patents" except to associated companies. Bell's ordering of equipment from Krupp was merely an exercise of Bell's rights under the "have made" clause of its licenses. That clause permitted Bell to have the equipment made for it by Krupp. Bell did not authorize Krupp to make the equipment for or sell it to anyone other than Bell, and thus did not grant a sublicense to Krupp. The difference between a licensee's exercise of his "have made" rights and his granting of a sublicense was well stated by the United States Court of Claims:

> A licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others to do all the work connected with the production of the article for him. Production of the article for the use of the licensee is production under the license.

Not so under a sublicense, unless the sublicensee is producing for the original licensee. To produce for his own use or for the use of someone else, the sublicensee may do so only under a sublicense. So the test is, whether the production is by or for the use of the original licensee or for the sublicensee himself or for someone else.

*Carey v. United States*, 326 F.2d 975, 979–80, 164 Ct.Cl. 304 (1964). The "have made" rights received and exercised by Bell are thus not precluded by Section X(G)(3) of the consent decree.

The ITC properly rejected Southwire's illegality arguments, Bell having neither acquired title to Southwire's patents nor granted or received the right to grant sublicenses under those patents to Krupp.

### III.  Equitable Estoppel

Southwire argues that Western was guilty of inequitable conduct in refusing to supply documents Southwire says it was entitled to receive under the development contract, and that such conduct estops Bell from relying on the licensing provision of the contract. We disagree.

Article V, Section 3(e) of the 1962 development contract provides:

> Nothing contained in this contract shall be construed as . . . an obligation to furnish any manufacturing or technical information except as provided in Section 1 of Article III hereof and subdivision (iv) of paragraph (b) of Section 2 of this Article V.

Section 1, Article III requires *Southwire* to supply specified information. It does not, however, impose a similar obligation on *Western*. Western's only obligation to supply information is found in Article V, Section 2(b), which relates only to inventions made jointly by Western and Southwire employees. Southwire does not contend that the information it sought related to joint inventions.

Southwire relies on Section 2(a), Article III, which gives each party the right, one year *after* the end of the contract period, to "reproduce, use, have used, disclose and dispose of any and all information, knowledge or data originated or first produced by SOUTHWIRE, or WESTERN, or their respective employees, in the course of any work performed under this contract . . ." Southwire overlooks Section 2(b), Article III however. That section states that, *prior* to the end of the one year period, Southwire and Western must "exercise reasonable care to avoid publication or other disclosure" of the information referred to in Section 2(a) "to any third parties not under a written obligation to keep such information confidential." When sections 2(a) and 2(b) are read together it is apparent that section 2(a) is nothing more than a release from the confidentiality obligation of section 2(b) at the end of the one year period. Section 2(a) merely provides the parties a more relaxed set of information handling and disclosure *rights* after the one year period. It does not, however, impose a *duty* on either party to supply information to the other.

Western having had no duty to supply information to Southwire, Southwire's allegations respecting Western's refusal to do so fail to demonstrate breach of contract or any inequitable conduct by Western sufficient to estop Bell from relying on its license under the 1962 contract.

### IV.  Timeliness

Southwire contends that Bell's Motion 52–250 was a motion for summary determination under Rule 210.50 and that it was untimely because it was not filed 30 days prior to hearing as required by that rule.[6] The ITC found sufficient reasons to

---

**6.** Rule 210.50, 19 CFR § 210.50 (1979) provides in pertinent part:

**Summary determinations.**

  (a) *Motions for summary determinations.* Any party may move with any necessary supporting affidavits for a summary determination in his favor upon all or any part of the issues to be determined in the investigation. Counsel or other representatives in support of the complaint may so move at any time after twenty (20) days following the date of service of the complaint and notice instituting the investigation, and any other party or a respondent may so move at any time after

waive the 30 day requirement of Rule 210.-50.[7] We find those reasons persuasive.

Bell designated both of its motions as Rule 210.51 motions to "terminate" based on license.[8] Bell could not have known that the ITC would interpret them as motions for summary determination under Rule 210.50 until the ITC order of March 29, 1979 wherein motion 52–41 was so treated. That order was rendered one day *after* the commencement of the evidentiary hearing. Bell was thus totally unaware of the need to file motion 52–250 as a motion for summary determination under Rule 210.50 until the time for filing such a motion had expired. Moreover, motion 52–250 was based primarily on the March 29th finding on the '994, '430, and '423 patents. It was thus reasonable for Bell to wait for that determination before filing motion 52–250, a virtually identical motion respecting the '170 patent.

■ Waiver of the time requirement imposed by Rule 210.50 is a matter committed to ITC discretion. *See American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970). The ITC's exercise of that discretion in the present case was justified and it resulted in no prejudice to Southwire. Southwire provided extensive argument in its opposition to Bell's motion, the motion having presented issues that were nearly identical to issues Southwire had addressed in opposing motion 52–41.

Southwire argues that the ITC failed to abide by Rule 201.1[9], saying that Rule 210.-50, a rule of special application, is inconsistent with and should prevail over Rule 201.-4(b), a rule of general application.

That argument is unavailing. There is no inconsistency between a rule imposing a time requirement, *e. g.*, Rule 210.50, and a rule giving the ITC authority to waive such requirement for good cause, *e. g.*, Rule 201.-4(b).

### Conclusion

Bell was licensed for its Gaston facility. That license was not illegal under the consent decree. Bell was not equitably estopped from using the license as an affirmative defense. The ITC properly exercised its discretion to entertain and decide motion 52–250 despite its untimeliness. Accordingly, the ITC's determinations of March 29, 1979 and June 20, 1979 granting motions 52–41 and 52–250 respectively and terminating the investigation with respect to the '994, '430, '423 and '170 patents insofar as they related to Bell and to Krupp's activities at Gaston is *affirmed*.

the date of publication in the *Federal Register* of the notice instituting the investigation. Any such motion by any party, however, must be filed at least thirty (30) days before the date fixed for any hearing herein provided.

7. Waiver of the rules is specifically provided for by Rule 201.4(b), 19 CFR § 201.4(b) (1979):
   (b) *Alteration or waiver of rules.* Rules in this chapter may be amended, waived, suspended, or revoked by the Commission only. A rule may be waived or suspended only when in the judgment of the Commission there is good and sufficient reason therefor, provided the rule is not a matter of procedure required by law.

8. Rule 210.51, 19 CFR § 210.51 (1979) provides in pertinent part:
   **Termination of investigation.**
   (a) *Motions for termination.* Any party may move *at any time* for an order to terminate an investigation before the Commission, to terminate the investigation as to all issues in an investigation in regard to one or more, but not all, of the respondents, or to terminate the investigation as to any part of the issues in regard to any or all of the respondents. When a motion for termination is based upon licensing or other written agreements entered into between the parties, a copy of such licensing or other agreements shall be included with the motion. [Emphasis added.]

9. Rule 201.1, 19 CFR § 201.1 (1979) provides:
   **§ 201.1 Applicability of part.**
   This Part 201 relates generally to functions and activities of the Commission under various statutes and other legal authority. Rules having special application appear separately in Parts 202 and 207, inclusive, of this chapter. In case of inconsistency between a rule of general application and a rule of special application, the latter is controlling.

MILLER, Judge, concurring.

I agree with the majority's resolution of the first three issues. However, I disagree with its disposition of the "timeliness" issue in agreeing with ITC's waiver of the 30-day requirement of Rule 210.50.[1] As the majority points out, Bell's motion 52–250 was filed under 19 CFR 210.51 (termination of investigation).[2] The ITC treated it not only as a motion for termination, but, erroneously it seems to me, also as a motion for summary determination. It said that "a summary determination on the issues must be reached in this case before a termination based on licenses, pursuant to Rule 210.51, can be granted." However, there is nothing in this case that compels such a conclusion. Moreover, a motion for termination is not restricted to a situation in which a license or other written agreement is involved. The rule merely provides that when a motion for termination is based upon licensing "a copy of such licensing . . . agreements shall be included with the motion." Bell's motion should have been treated *solely* as a timely motion for termination, thus avoiding any need to consider waiver of the 30-day requirement of Rule 210.50.

Because ITC's analysis of the substance of Bell's motion 52–250 was correct, and because ITC correctly treated it as a motion for termination, ITC's error in treating it also as a motion for summary determination was harmless.

---

**1.** The majority opinion states the issue as "whether Bell's motion 52-250 was timely filed."

**2.** Under Rule 210.51, a motion for termination can be made "at any time."