INTEL CORPORATION, Plaintiff,

v.

BROADCOM CORPORATION, Defendant.

No. 00–796–RRM.

United States District Court, D. Delaware.

Nov. 20, 2001.

202

J. Andrew Huffman, Fish & Richardson P.C., Wilmington, Delaware; John E. Gartman, and Juanita Brooks, Fish & Richardson P.C., San Diego, California; for plaintiff.

Richard H. Morse, and John W. Shaw, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware; Ron E. Shulman, and Rodney Strickland, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California; Raphael L. Lupo, Terrance McMahon and Vera Elson, McDermott, Will & Emery, Menlo Park, California; for defendant.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a patent case. Plaintiff Intel Corporation is a Delaware corporation with its principal place of business in Santa Clara, California. Intel owns U.S. Patent Nos. 4,823,201 (the '201 patent); 4,975,830 (the '830 patent); 5,894,410 (the '410 patent); 5,079,630 (the '630 patent); and 5,134,478 (the '478 patent). Defendant Broadcom Corporation is a California corporation with its principal place of business in Irvine, California.

On August 30, 2000, Intel filed its complaint in this case alleging that Broadcom is infringing, inducing infringement of, or committing acts of contributory infringement of one or more claims of the '201 patent, the '830 patent, the '410 patent, the '630 patent, and the '478 patent. In order to simplify the issues before the jury and to shorten the length of the jury trial, the court has since required that the trial proceed in two parts. The first trial is scheduled to begin on November 28, 2001, and will cover the '201 and the '830 patents. A subsequent trial will cover the remaining three patents.

On October 10, 2000, Broadcom moved to dismiss Intel's complaint or, in the alternative, to transfer the action to the United States District Court for the Northern District of California. After eleven months of discovery, the court heard oral argument on Broadcom's motion on September 24, 2001. In a memorandum opinion dated October 9, 2001, the court denied Broadcom's motion. Broadcom subsequently answered Intel's complaint on October 23, 2001. As Broadcom had indicated in earlier interrogatory responses, the answer included a number of affirmative defenses relating to license agreements.

In anticipation of these affirmative defenses, Intel has filed three sets of partial summary judgment motions relating to Broadcom's license defenses. Broadcom has cross-moved for summary judgment on the latter two of these motions.

On September 21, 2001, Intel moved for summary judgment that Broadcom's allegedly infringing products are not licensed under the '830 or '410 patents. Intel argues that the scope of the January 22, 1995 Intel Product Development and License Agreement (the "Joint Development Agreement") between Intel and Broadcom does not include a license for Broadcom to make, sell, or use the accused products in this suit under either the '830 or '401 patent. Broadcom filed its answering brief on October 12, 2001 and later filed a corrected answering brief on October 18, 2001. Intel filed its reply brief in support of its summary judgment motion on October 22, 2001.

On September 28, 2001, Intel moved for summary judgment that Broadcom's allegedly infringing products are not licensed under an Intel–Motorola license agreement (the "Motorola Agreement"). This motion relates to Broadcom's affirmative defense that its products accused of infringing the asserted claims of the '478,- '201, and '630 patents are licensed by Intel to the extent those products were made for or sold to General Instrument Corporation, a wholly owned subsidiary of Motorola, Inc, pursuant to a June 9, 1997 license agreement between Intel and Motorola that gives Motorola the right to "have [Licensed Products] made" for it. On October 18, 2001 Broadcom cross-moved for summary judgment that the accused products it sells or has sold to General Instrument Corporation are licensed under the Motorola Agreement. On the same day, Broadcom filed its answering brief in opposition to Intel's motion and opening brief in support of its cross-motion for partial summary judgment. On October 25, 2001, Intel filed its reply brief in support of its motion and answering brief in opposition to Broadcom's cross-motion. On November 1, 2001, Broadcom replied to Intel's answering brief.

On October 16, 2001, Intel moved for summary judgment that Broadcom's accused products are not licensed under Intel license agreements with Sony Corporation, NEC Corporation, Samsung Corporation, Siemens AG, and Compaq Corporation to the extent those products were made for or sold to those companies. On October 30, 2001, Broadcom

cross-moved for summary judgment that Broadcom's sales to various Intel licensees of accused products that qualify as "Licensed Products" under the individual terms of the license agreements are licensed by Intel and are therefore noninfringing. The Intel licensees listed by Broadcom are the five companies referred to in Intel's summary judgment motion and the following seven additional companies: AT & T Corporation, Hayes Microcomputer Products, Inc., Hewlett-Packard Corporation, Hitachi Ltd., Hyundai Electronics Industries Co., Ltd., Mitsubishi Electric Corporation, and N.V. Phillips Gloeilampenfabrieken. Also on October 30, Broadcom filed its answering brief in opposition to Intel's summary judgment motion and its opening brief in support of its cross-motion. On November 6, 2001, Intel filed a reply brief in support of its motion and answering Broadcom's cross-motion. Broadcom filed its reply brief in support of its cross-motion on November 13, 2001.

These five motions for partial summary judgment on license defenses are now fully briefed. This is the courts decision on those motions.

## I. DISCUSSION

### A. Standard for Decision

■ At trial, as the party asserting certain affirmative license defenses, Broadcom would bear the burden of proving each of these defenses. *See McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir.1995). Acts can be infringements only if they are carried out "without authority." 35 U.S.C. § 271(a), (f), (g). Thus for each of the license defenses it asserts, Broadcom must prove at trial either that it has a license from Intel that authorizes it to make, use, and sell its accused products or that its development and subsequent sale of accused products to

Intel licensees was authorized under those licensees' licenses with Intel.

Federal Rule of Civil Procedure 56 provides for summary judgment in a party's favor on "all or any part" of a claim when, upon reviewing the factual record developed by the parties, there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a), (c).

Under Rule 56, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant may meet this burden by "showing—that is, pointing out to the [ ] court—that there is an absence of evidence to support [the non-moving party's] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has made the required showing, the non-moving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue for trial is present when the record would enable a reasonable trier of fact to find in favor of the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

■ Many of the issues presented in the parties' motions are essentially questions of contract interpretation. Contract interpretation is treated as a question of law. *Klair v. Reese,* 531 A.2d 219, 222 (Del. 1987) (applying Delaware law); *see also United States v. King Features Entmn't, Inc.,* 843 F.2d 394, 398 (9th Cir.1988) (applying California law). When necessary, the court will determine whether, as a matter of the applicable law under each

agreement, extrinsic evidence may be considered by a fact finder to interpret ambiguous sections of a license agreement or whether the agreement at issue is unambiguous.

In this case, in order for the court to grant summary judgment in favor of Intel on Broadcom's license defenses, Intel must show that no reasonable fact finder could return a verdict in Broadcom's favor on its license defense. In order to grant summary judgment in favor of Broadcom on its license defenses, Broadcom must show that no reasonable fact finder could return a verdict in Intel's favor on Broadcom's license defenses. With these standards in mind, the court will turn to the substance of the parties' motions.

B. *Should the Court Grant Intel's Motion for Summary Judgment That Broadcom's Accused Products Are Not Licensed Under the '830 and '410 Patents?*

1. *The Intel–Broadcom Joint Development Agreement*

On January 22, 1995, Intel and Broadcom entered into a joint development agreement entitled "Intel Product Development and License Agreement." While the parties dispute the intended and ultimate scope of the agreement, according to the agreement itself, the Joint Development Agreement contemplates each party exchanging proprietary technology to jointly develop a specific 100 Mbps Ethernet silicon chip ("the Product").

In order to accomplish this goal, pursuant to the agreement, Intel agreed to deliver certain of its hardware and software technologies to Broadcom (the "Intel Deliverables") and Broadcom agreed to deliver certain of its digital signaling technology to Intel (the "Broadcom Deliverables"). That much is clear from the Joint Develop-

ment Agreement's section entitled "Recitals," which states in full that:

Broadcom is a developer of certain digital signaling technology; and

Intel is a developer of certain hardware and software technologies. Intel desires to license Broadcom's above technology for use in jointly developing with Broadcom a 100 Mbps Ethernet silicon chip. Intel also desires to grant a limited license to its foregoing technologies to Broadcom for Broadcom to manufacture the foregoing chip and for each Party to make, use, market, sell, and distribute such chip subject to this Agreement. The Parties also desire that Intel use the above license from Broadcom to create a 100 Mbps Ethernet adapter card based on such chip for Intel to exclusively market and distribute subject to the terms herein and market other software and hardware Intel products related thereto.

In section 1.15, the Joint Development Agreement defines the jointly developed "Product" as "only the silicon chip defined by the Product Specifications developed pursuant to this Agreement, which chip is derived from Broadcom Deliverables and includes certain Intel Deliverables and Upgrades." The "Product Specifications" are defined as "the specifications in PHY 100 EAS Release Revision 1.3 (October 1994) and Data Sheet for the Product," both of which were attached to the Joint Development Agreement as Exhibit B.

The most relevant sections of the Joint Development Agreement to the parties' dispute are sections 5.2 and 5.4, which are respectively entitled "License to Broadcom" and "Patent Covenant." The court will reproduce each section below.

Section 5.2 states:

Intel grants to Broadcom a royalty-free, nonexclusive, perpetual, worldwide, non-

transferable, revocable for material breach license to make, use, sell, reproduce, modify for internal and external use, advertise, market, make and have made by third parties to supply Broadcom hereunder and not for any such third parties to compete, directly or indirectly, with Intel, Broadcom Developments of, make and have made by third parties to supply Broadcom hereunder and not for any such third parties to compete, with Intel, incorporate, or license, and distribute the Intel Deliverables in physical form solely as an integral part of or incorporated in products to end users directly or indirectly through Broadcom's distribution channel of, without limitation, distributors, resellers, OEMS and representatives, subject to the exclusivity requirements and limitations set forth in Exhibit F.

Section 1.3 of the Joint Development Agreement indicates that the defined term "Broadcom Developments" means "hardware, derivative works, updates, enhancements, translations, and/or revisions of Intel Deliverables which incorporate or are derivatives of Intel Deliverables, developed by or for Broadcom and subject to the exclusivity requirements and limitations set forth in Exhibit F." Section 5.1 of the agreement grants an identical license to Intel with respect to Intel Developments of the Broadcom Deliverables. Thus these two sections, taken together, demonstrate that the agreement contains a mutual license between the parties to effectuate the parties' joint development effort.

Section 5.4, the patent covenant section, states:

Each Party agrees that with respect to any patent which, as of the Effective Date, it owns or under which it has the right to grant licenses of the scope of the licenses granted in this Agreement, or any patent which may later issue which is related to the Product and based, in whole or part, on the IEEE 802.3 100 BaseT specification, it will not assert against the other Party to restrict its rights under this Agreement, nor against such Party's subsidiaries, licensees, or vendees, mediate or immediate, with respect to the Product, any claims for infringement based on the manufacture, use, or sale of any apparatus made of sold by, for or under license from that Party.

Section 5.5 further qualifies the intellectual property license. It contains a provision that states that "the license grants in this Agreement do not include any right ... to Intel component level microprocessor technology ... including, but not limited to, the Intel X86 microprocessor chip series ...."

### 2. *The Parties' Positions*
#### a. *Intel's Position*

Intel argues that the Joint Development Agreement does not grant to Broadcom any license to the '830 or '410 patents based on two limitations in section 5.4 (the patent covenant section) of the agreement. Under section 5.4, the patent license is limited to (i) patents that were owned by a party at the time of the agreement (January 22, 1995), or later issued; and (ii) patents that relate to the Product defined by the agreement and are based on the IEEE 802.3 100 BaseT specification. The IEEE 802.3 100 BaseT specification is the networking standard for 100 Mbps Fast Ethernet that has been agreed upon by the 802.3 working group of Institute of Electrical and Electronics Engineers.

Intel argues that because the '830 patent issued in 1990, but was not acquired by Intel until December 28, 1998, the '830 patent is not licensed under the patent covenant section of the agreement. The '830 patent was acquired by Intel

through the merger with, and later liquidation of, Dayna Communications, Inc. The '830 patent issued on December 4, 1990 and listed Dayna Communications as the Assignee. On October 10, 1997, Intel and Dayna entered into a Plan of Merger under which Dayna Communications would continue as a wholly owned subsidiary of Intel. On December 28, 1998, Dayna Communications was dissolved, giving Intel "all assets of Dayna, tangible and intangible, real and personal . . . ." The transfer of the '830 patent was recorded with the U.S. Patent and Trademark Office on that same day. The '830 patent automates the process by which devices on a network that can communicate by multiple formats select the optimal format for communication. Intel alleges in this lawsuit that the '830 patent covers the process known as "auto-negotiation" that is used in Broadcom's ethernet devices and described in the IEEE 802.3 standard.

Intel's '410 patent is entitled "Perimeter Matrix Ball Grid Array Circuit Package with a Populated Center." The '410 patent relates to a type of ball-grid-array semiconductor package that carries an integrated circuit; this technology is not described in the Joint Development Agreement's specifications defining "the Product" and is unrelated to the IEEE 802.3 BaseT specification. Therefore, Intel argues that the '410 patent is not licensed under the patent covenant in the agreement.

Intel further argues that even if the court were to find that the patent covenant grants Broadcom a license to the '830 and '410 patent, summary judgment would still be appropriate on a separate ground. The Agreement between Intel and Broadcom only grants a license "with respect to the Product" jointly developed by the parties, which is defined in the agreement as only the specific silicon chip jointly devel-

oped by Intel and Broadcom in accordance with the specifications set forth in the agreement. Intel contends that because Broadcom cannot demonstrate that any of the accused products are the "Product" jointly developed by Intel and Broadcom, partial summary judgment in its favor is appropriate.

### b. *Broadcom's Position*

Broadcom takes issue with Intel's interpretation of the agreement, and argues that section 5.2, entitled "License to Broadcom," and not section 5.4 defines the scope of the license. As noted above, section 5.2 provides Broadcom with a perpetual, worldwide license to make, use, sell, reproduce, modify, and market "Broadcom Developments" of the "Intel Deliverables." Intel Deliverables is defined in the agreement to include the VHDL hardware description code for "auto-negotiation," a key feature of the allegedly infringing products sold by Broadcom.

According to Broadcom, section 5.2 confers a license to all Intel patents (and other rights) with respect to "Broadcom Developments of . . . Intel Deliverables." Broadcom bases this argument on the meaning of Broadcom Developments, which is defined as "hardware, derivative works, updates, enhancements, translations, and/or revisions of the Intel Deliverables which incorporate or are derivatives of Intel Deliverables, developed by or for Broadcom . . . ." Broadcom contends that this definition demonstrates that the Joint Development Agreement did not only grant patent rights relating to the defined "Product," but instead granted a broad set of rights to make future products that are derived from the chip that is the subject of the agreement. Broadcom thus claims that Intel provided Broadcom with the allegedly infringing auto-negotiation technology along with an express license to modify Intel's technology and make derivative

works to be incorporated into Broadcom's products. Therefore, the products accused of infringing the '830 and '410 patents cannot infringe because they are expressly licensed by Intel.

In Broadcom's view, section 5.4 does not limit, but rather supplements, Intel's license grant to Broadcom. Section 5.4 complements section 5.2 by extending the license of section 5.2 to vendees and remote users who might otherwise be subject to patent infringement claims. Accordingly, Broadcom opposes Intel's motion for summary judgment on the Joint Development Agreement, arguing that there is a material issue of fact as to the scope of the license in the agreement.

### 3. *The Court's Decision*

#### a. *Principles of Applicable Law*

■ A license agreement is a contract governed by state law. *See Power Lift, Inc. v. Weatherford Nipple–Up Systems, Inc.,* 871 F.2d 1082, 1085 (Fed.Cir.1989). Pursuant to Section 25 of the Joint Development Agreement, which states that "[the] Agreement will be governed and interpreted by the laws of the State of California," the court will interpret the agreement under California law.

■ Under California law, contract interpretation is a matter of law that is to be decided by the court. *King Features,* 843 F.2d at 398 ("Interpretation of a contract is a matter of law ....."); *see also Shaw v. Regents of University of California,* 58 Cal.App.4th 44, 67 Cal.Rptr.2d 850, 855 (1997). Moreover, "the determination of whether a written contract is ambiguous is a question of law that must be decided by the court." *Brobeck, Phleger & Harrison v. Telex Corp.,* 602 F.2d 866, 871 (9th Cir.1979); *see also King Features,* 843 F.2d at 398.

■ In California, "[a] contract must be interpreted so as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ.Code § 1636; *see also AIU Ins. Co. v. Superior Ct.,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253, 1264 (1990) ("the mutual intention of the parties at the time the contract is formed governs interpretation"). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *AIU Ins. Co.,* 274 Cal. Rptr. 820, 799 P.2d at 1264 (citing Cal. Civ.Code § 1639). In construing a contract, "no term shall be considered uncertain or ambiguous if its meaning can be ascertained by fair inference from the terms of the agreement." *Ellis v. McKinnon Broadcasting Co.,* 18 Cal.App.4th 1796, 1802, 23 Cal.Rptr.2d 80 (1993). Thus, " '[i]f contractual language is clear and explicit, it governs.' " *Foster–Gardner, Inc. v. National Union Fire Ins. Co.,* 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265, 272 (1998) (quoting *Bank of the West v. Superior Ct.,* 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, 552 (1992) (citing Cal. Civ.Code § 1638)); *see also Marek v. Napa Community Redevelopment Agency,* 46 Cal.3d 1070, 251 Cal. Rptr. 778, 761 P.2d 701, 710 n. 11 (1988) ("[I]t is axiomatic that where, as here, the contract is clear and unambiguous, the intention of the parties should be ascertained from the writing itself and in such an instance extrinsic evidence is inadmissible."). If, however, the contract is ambiguous, extrinsic evidence regarding the parties' intent is admissible to help interpret the contract terms.

■ The mere fact of disagreement between the parties as to the correct interpretation of specific terms or sections of the agreement does not render it ambiguous. *See, e.g., Klamath Water Users Pro-*

*tective Ass'n v. Patterson,* 204 F.3d 1206, 1210 (9th Cir.1999) ("The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous"). Rather, the determination of whether a contract is ambiguous is the court's to make.

■ California law allows the court to provisionally receive extrinsic evidence to aid in its determination of whether the contract at issue is ambiguous. *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 40, 69 Cal. Rptr. 561, 442 P.2d 641 (1968). If, after considering all of the evidence, the court determines that the contract is unambiguous, any extrinsic evidence that has been submitted for the purpose of demonstrating an ambiguity in the contract is no longer relevant. *See Brobeck,* 602 F.2d at 871 (explaining that under *Pacific Gas,* extrinsic evidence "cannot be received" if "after considering [the] preliminary evidence" the court finds the language of the contact to be unambiguous); *City of Manhattan Beach v. Superior Ct.,* 13 Cal.4th 232, 52 Cal.Rptr.2d 82, 914 P.2d 160 (1996) ("If the intent of the parties is clear, that will control. If not, extrinsic evidence may be considered to the extent that it informs that intent."); *Olsen v. Breeze, Inc.,* 48 Cal.App.4th 608, 55 Cal.Rptr.2d 818, 830 n. 5 (1996) ("[P]arol evidence is inadmissible if the contract terms are unambiguous"). However, when the court finds that a contract is ambiguous, the extrinsic evidence may be used by the court to interpret the ambiguous terms. *See Pacific Gas,* 69 Cal.2d at 40, 69 Cal.Rptr. 561, 442 P.2d 641; *Morey v. Vannucci,* 64 Cal.App.4th 904, 912, 75 Cal.Rptr.2d 573 (1998).

■ California law also requires that the court construe the contract as a whole. Cal. Civ.Code § 1641; *Sy First Family, Ltd. v. Cheung,* 70 Cal.App.4th 1334, 83 Cal.Rptr.2d 340, 345 (1999) ("[W]here

practicable, the meaning of an agreement must be derived from a reading of the whole contract."). Accordingly, in interpreting a contract, "[t]he whole of the contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Id.* "Where two clauses of an agreement appear to be in direct conflict, it is the duty of the court to reconcile such clauses so as to give effect to the whole of the instrument." *Ellis,* 18 Cal.App.4th at 1802, 23 Cal.Rptr.2d 80; *see also Brobeck,* 602 F.2d at 872 (contracts should be interpreted to be "internally consistent"); Restatement of Contracts § 235(c) (1932) ("A writing is interpreted as a whole").

b. *Which Section Controls the Scope of Broadcom's License?*

■ As noted above, the key dispute between the parties is which section of the Joint Development Agreement controls the extent of Intel's patent licenses to Broadcom. Intel contends that the Section 5.4 Patent Covenant defines the patent license granted by Intel to Broadcom, while the Section 5.2 License to Broadcom deals with the rest of Intel's intellectual property rights in the Intel Deliverables. Broadcom contends that section 5.2 provides the basic grant of patent rights to Broadcom, while section 5.4 grants Broadcom additional patent rights above beyond those granted in section 5.2. According to Broadcom these additional patent rights were granted to ensure that Intel could not frustrate the license grant of section 5.2 by asserting patent rights against Broadcom or its vendees which would have the effect of impairing the manufacture and sale of the products licensed by section 5.2.

Section 5 of the Joint Development Agreement is entitled "License Grants." The subsections within section 5 relate to

distinct intellectual property rights. The court briefly reviews these sections below.

In section 5.1 and 5.2, Intel and Broadcom mutually license certain of each other's proprietary technologies, defined as Intel Deliverables and Broadcom Deliverables. Exhibit B.2 lists and defines the Intel and Broadcom Deliverables. Under Exhibit B.2, Broadcom is to provide to Intel a specified data base, full chip hierarchical netlists, data sheets and design specifications, and simulation and performance evaluation results. Intel is to provide to Broadcom VHDL source code, simulation programs for certain functional design blocks, design reports, certain production test packages, product schematics, and certain Intel network interface card products. According to the definitions section, both parties' Deliverables were based on proprietary Technology that included a number of different types intellectual property rights, such as patents, copyrights, mask works, trade secrets, know-how, trademarks. See ¶¶ 1.3, 1.4, 1.8, 1.9. Sections 5.1 and 5.2 do not expressly set forth a patent license grant. Rather the license provided for by these two sections allows Intel to make, use, sell, and modify Intel Developments of the Broadcom Deliverables and allows Broadcom to make, use, sell, and modify Broadcom Developments of the Intel Deliverables.

Section 5.4 sets forth a mutual patent license with respect to any patent owned by a party as of January 22, 1995 or any patent which may later issue "which is related to the Product and based, in whole or in part, on the IEEE 802.3 100 BaseT specification." It is the only section in the Joint Development Agreement that expressly addresses patent rights.

While neither section 5.3 or 5.5 are central to the parties' dispute, for the sake of completeness, the court lists them here. Section 5.3 states that the parties must maintain any copyright notices that exist on the deliverables that they receive from each other and that the other party's copyright notice must be included in all marketing and end user documentation for the foregoing products. Section 5.5 expressly excludes from any license, any intellectual property right to Intel's component level microprocessor technology.

These sections, taken together, memorialize the parties' statements of intent from the Recitals section, which states that "Intel desires to license Broadcom's above technology for use in jointly developing with Broadcom a 100 Mbps Ethernet silicon chip" and that "Intel ... desires to grant a limited license to its foregoing technologies to Broadcom for Broadcom to manufacture the foregoing chip and for each Party to make, use, market, sell, and distribute such chip subject to this Agreement." Section 4.2, in the Ownership section of the agreement, makes it clear that sections 5.2 and 5.4 are the only relevant sections in which Intel "license[s], offer[s], or otherwise make[s] available to Broadcom the Intel Developments or Intel Technology." ¶ 4.2.

Given that section 5.2 and 5.4 are the sections of the agreement that convey license rights to Broadcom, it is essential that they be interpreted consistently with each other and with the intent of the parties. The primary issue before the court is to determine whether section 5.4 unambiguously defines the scope of the patent license, whether section 5.2 unambiguously defines the scope of the patent license, or whether the agreement is ambiguous as to which section defines the scope of the patent license. For the reasons set forth below, the court finds that section 5.4 unambiguously defines the scope of Broadcom's patent license.

The agreement contemplates a joint development effort accomplished through the

exchange of proprietary technology that includes the following intellectual property rights: patents, copyrights, mask works, trade secrets, know-how, trademarks. See ¶¶ 1.3, 1.4, 1.8, 1.9. Licenses and restrictions on those licenses are provided for by the subsections of section 5. Section 5.2, unlike section 5.4, contains no mention of patent rights, but rather deals with the rest of Intel's intellectual property rights in the Intel Deliverables. Section 5.4 is the only section of the agreement that relates to patent rights. It explicitly sets forth the terms of patent licenses exchanged between the parties.

A plain reading of the agreement demonstrates that the express patent grant in section 5.4, rather than section 5.2, controls the extent of Intel's patent licenses to Broadcom. This interpretation of the license is buttressed by recent Federal Circuit authority. *See State Contracting & Eng'g Corp. v. Florida,* 258 F.3d 1329, 1339–40 (Fed.Cir.2001) (noting that because patent rights and trade secret rights are distinct rights, the right to use proprietary technology does not necessarily convey any patent rights and the omission of an express provision providing for the licensing of patent rights demonstrated that the contract did not provide a license for patent rights); *Hilgraeve Corp. v. Symantec Corp.,* 265 F.3d 1336, (Fed.Cir. 2001) (holding that no patent license was conferred where plaintiff transferred all copyright, know-how, and technical expertise with respect to software to defendant). ▮ Broadcom nonetheless asserts that section 5.2 implicitly contains a patent license that is broader than the express patent license of section 5.4. While it is true that patent licenses may be implied by language or conduct of the owner, *see De Forest Radio Telephone & Telegraph Co. v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 71 L.Ed. 625 (1927), where an

agreement contains a specific provision expressly defining the scope of the patent license implied licenses dealing with the same subject matter are not generally recognized. *See, e.g., Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.1990) ("The existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract"); *Wal–Noon Corp. v. Hill,* 45 Cal.App.3d 605, 119 Cal.Rptr. 646, 650 (1975) ("There cannot be a valid express contract and an implied contract, each embracing the same subject matter, existing at the same time.").

In asserting that section 5.2 grants Broadcom a broad license to all of Intel's patents that are related to the Intel Deliverables and Broadcom Development of those deliverables, Broadcom claims that section 5.4 supplements section 5.2. Broadcom contends that the purpose of section 5.4 is to extend the licenses of section 5.2 to provide protection to Broadcom's third party customers. In support of this reading, Broadcom argues that section 5.2 "only grant[s] licenses that extend to the parties," so section 5.4 was necessary to provide "protection to the parties' 'licensees or vendees, mediate or immediate.' "

The plain language of sections 5.2 and 5.4 contradicts Broadcom's argument. Section 5.2, by its terms, applies to products sold or distributed "to end users directly or indirectly through Broadcom's distribution channel of, without limitation, distributors, resellers, OEMS and representatives." ¶ 5.2. Therefore it is incorrect that section 5.2 only extends its license protections to Broadcom. Similarly, section 5.4 states that each party will not assert patent claims for the specified licensed patents "against the other Party ... nor against the Party's subsidiaries,

licensees, or vendees ... any claims for infringement ...." ¶ 5.4. Therefore, section 5.4 cannot fairly be interpreted as a necessary extension of the protections of section 5.2 to the end users and distributors of Broadcom's products. Rather, the two sections are coextensive as to the third parties that they cover.

Broadcom asserts that an additional and unique purpose of section 5.4 is to extend the licenses of section 5.2 to include not only chip products, but larger products in which licensed chips are included. This assertion cannot be correct. Section 5.2, by its terms, licenses Broadcom Developments "in physical form solely as an integral part of or incorporated in products to end users." Therefore, according to the plain language of the agreement, section 5.2 already grants a license to intellectual property rights that covers larger products in which the chips are placed. In addition to being contradicted by the plain language of the agreement, Broadcom's construction is inherently self-contradictory. Section 5.4, cannot, as Broadcom asserts, cover additional products, if as Broadcom also asserts, section 5.2 already licenses all products that include, or are in any way derived from, or include a derivative of, Intel's Deliverables. Accordingly, section 5.4 cannot be fairly interpreted as extending the protections of section 5.2 to "additional products."

The proper interpretation of the Joint Development Agreement must give effect to each section of the contract. In light of the above analysis, if the court were to adopt Broadcom's interpretation of the agreement, section 5.4 would be rendered extraneous and unnecessary. Broadcom's reading would also create two patent licenses (the implied patent license in section 5.2 and the express patent license in section 5.4) within the same agreement whose scopes are in conflict. The implied

license of section 5.2 is unbounded, while the express license of section 5.4 is broad, but has limits. If the court were to find that section 5.2 confers to Broadcom a broad patent license that covers all products that are derived from the Intel Deliverables, the court would effectively be ignoring the specific limitations of the express patent license in section 5.4, which limits its scope to patents "related to the Product and based, in whole or part, on the IEEE 802.3 BaseT specification." ¶ 5.4. The only consistent reading of the provisions of the Agreement is to give full effect to the language of 5.4 as to the scope of the patent license that is conveyed within.

Reading section 5.4 as the section that defines the scope of the patent license that is granted in the Joint Development Agreement is consistent with both the parties stated intent in the recitals section, the clear language of the agreement, and the extrinsic evidence that has been submitted by the parties. Broadcom argues that while the agreement was structured to jointly develop one particular semiconductor product ("the Product"), the agreement further provided for and licensed, the ability of both Intel and Broadcom to sell derivatives developed by Broadcom from the technology that Intel provided to it. The patent grant of section 5.4 is not inconsistent with this reading. Section 5.4 *does* grant a broad patent cross-license to the parties. That license includes any patents owned as of the effective date of the contract or any patents which may later issue, "which [are] related to the Product and based, in whole or part, on the IEEE 802.3 100 BaseT specification." While the patent license of the Joint Development Agreement is limited to this related set of patents, this provision is not inconsistent with the parties' intent to enter into a cross-license that allows Broadcom to make the specific chip and derivatives

thereof which relate to the 802.3 BaseT specification.

Broadcom argues that if the court were to interpret section 5.4 as the governing patent license in the agreement, section 5.4 would be inconsistent with various warranty and indemnification provisions within the agreement. *See, e.g.,* ¶¶ Exhibit A 4.3, 13.1, 17.2.1, 17.2.3.1. The court sets forth these provision below.

In Exhibit A Section 4.3, Intel warrants that it:

> has all right, title and ownership to the Intel Technology and Intel Deliverables including any patents, copyrights, mask works, trade secrets, trademarks, and other intellectual property rights pertaining to the Intel Technology and Intel Deliverables including, without limitation, the right to grant the license herein to Broadcom and ... it will take no action which would in any way impair the foregoing.

In Section 13.1, entitled "Exceptions to Intel Releases," of the Second Amendment to the Joint Development Agreement, Intel warranted that "it has no claim or knowledge of facts that could give rise to a claim, against Broadcom under any such agreements or relationships." Section 17.2.3.1, entitled "Obligation to Assist," states that "Intel shall use commercially reasonable efforts to attempt to procure for Broadcom ... the right to continue using the Intel Technology and Intel Deliverables ...." In section 17.2.1, entitled "Indemnification," Intel warrants that it will "indemnify Broadcom based on a claim that the Intel Technology or Intel Deliverables, respectively, alone and not in combination with any other products, infringe any patent, copyright, trade secret, or other intellectual property right of a third party."

The court disagrees that a construction finding that section 5.4 is the controlling section of the grant of patent rights in the agreement is inconsistent with the foregoing provisions. Broadcom's argument presupposes that the purpose of the agreement was to provide Broadcom with a broad license to all of Intel's patents that relate to any Broadcom developed derivative of the Intel Deliverables. Nothing in the interpretation that 5.4 is the controlling provision of the patent license is inconsistent with these provisions. Given that the agreement contemplated the parties using each other's technology to develop a chip product, the warranty of section 4.3 sought to assure Broadcom that as of the effective date of the agreement, Intel actually owned rights to the technology and deliverables. Intel's grant to Broadcom of the specific patents encompassed by section 5.4 is not inconsistent with this warranty that Intel "has all right, title and ownership to the Intel Technology and Intel Deliverables."

Broadcom also argues that if 5.4 is read to be the controlling patent license it is inconsistent with sections 17.2.3.1 and 17.2.1. This argument fails for the same reason. The Broadcom rights that the indemnification and warranty provision are intended to cover are defined in section 5.4. These sections are intended to warrant that those rights, *as defined by the patent grant of section 5.4,* will not be impaired in any way.

For the reasons set forth in the preceding analysis, the court finds that it is clear from the Joint Development Agreement, that section 5.4 alone defines the scope of the patent license grant between the parties therein. This interpretation of the contract is the only interpretation that is consistent with the other terms of the contract and that gives effect to all sections of the contract.

c. *Does the Section 5.4 Grant Broadcom a License Under the '830 and '410 Patents?*

 Having determined, as a matter of law, that section 5.4 is the controlling patent license provision in the Joint Development Agreement, the court must next determine whether section 5.4 grants to Broadcom a License under either the '830 and '410 patents. Section 5.4, in relevant portion, grants a license to Broadcom for:

> any patent which, as of the Effective Date, [Intel] owns or under which [Intel] has the right to grant licenses of the scope of the licenses granted in this Agreement, or any patent which may later issue which is related to the Product and based, in whole or part, on the IEEE 802.3 100 BaseT specification

The scope of the license conferred in section 5.4 (i.e. which patents are included in the license) is limited by the two requirements stated within that section. Those patents that do not meet both requirements are not included within the license. First, the patent must be owned by Intel as of January 22, 1995 or must be issued after January 22, 1995. Second, the patent must be "related to the Product and based, in whole or part, on the IEEE 802.3 BaseT specification."

Intel submits that because the '410 and '830 patents each fail to meet one of these two requirements, they are not licensed to Broadcom under the Joint Development Agreement. As set forth in more detail above in the section outlining the parties' arguments, Intel contends that the '830 patent is not included in the section 5.4 patent license because it was neither owned by Intel as of January 22, 1995, nor issued after January 22, 1995. Rather, the '830 patent issued on December 4, 1990, to Dayna Communications, a company that was later acquired by Intel on October 10, 1997. The '830 patent was subsequently transferred to Intel on December 28, 1998.

Broadcom does not dispute that section 5.4, as originally executed, did not include any license to the '830 patent because Intel did not own the '830 patent on the Effective Date. Rather, Broadcom argues that because the Joint Development Agreement was amended on December 17, 1997, after Intel's acquisition of Dayna Communications, and that amendment modified the agreement, "incorporat[ing] by reference the terms, conditions, and covenants set forth in the Agreement," December 17, 1997, the date of the execution of the amendment, replaces January 22, 1995 as the Effective Date of the agreement. Broadcom contends that because the '830 patent was owned by Intel prior to this new effective date, the '830 patent is included in the set of patents that is licensed under section 5.4. The parties do not appear to dispute that the '830 patent relates to the IEEE 802.3 BaseT specification and thus satisfies the second requirement of the patent license.

The court finds that Broadcom's argument that section 5.4 was republished with a new effective date of December 17, 1997 is contrary to the plain language of the amendment. Section 1 of the December 17, 1997 amendment states that original terms of the Joint Development Agreement, such as Effective Date, are incorporated by reference and retain "the respective meanings as set forth and assigned in the [Joint Development] Agreement." This means that the term Effective Date retained its meaning of January 22, 1995. While the amendment introduced the term "Amendment Effective Date," it did not amend the language of section 5.4. Because after the amendment, section 5.4 continues to use the term "Effective Date" and not the new term "Amendment Effec-

tive Date," the scope of section 5.4 remains limited to patents owned by Intel as of January 22, 1995.

■■■ Moreover, even if Broadcom's interpretation of the amendment were correct, the '830 patent would still not be included in the scope of section 5.4 because Intel did not own the '830 patent as of the Amendment Effective Date. It is undisputed that although Intel and Dayna merged on October 10, 1997, pursuant to section 1.1(d) of the Plan of Merger, that after the merger Dayna Communications would continue as a wholly owned subsidiary of Intel. Therefore, Dayna Communications—not Intel-owned the '830 patent as of the Amendment Effective Date. Intel did not acquire the rights to the '830 patent until December 28, 1999, when Dayna Communications was dissolved and its assets were transferred to Intel. Section 5.4 does not extend the scope of the license to patents owned by Intel subsidiaries; it refers only to patents owned by or issued to Intel itself. While Broadcom again argues that this interpretation is contrary to Intel's section 4.3 warranty that it would take no action which would in any way impair its grant of license to Broadcom, this warranty in no way precludes suing Broadcom for infringement for a patent, such as the '830 patent, that is not covered by Intel's license grant to Broadcom. While Broadcom argues that the circumstances by which Intel acquired the '830 patent wrongly takes advantage of an unintended loophole in the agreement, the clear language of section 5.4, which the court may not ignore, excludes the '830 patent from the license grant.

The court now turns to the '410 patent. It is undisputed that the '410 patent, which relates to a "ball grid array" semiconductor package that carries an integrated circuit, is not related to the 100 Mbps chip that is the defined "Product" of the Joint Development Agreement. It is also undisputed that the '410 patent is not based on the IEEE 802.3 100 BaseT specification, which, as described above, relates to Ethernet networks. The '410 patent is therefore not included in the patent license in section 5.4, which includes only patents that are related "to the Product and based, in whole or part, on the IEEE 802.3 100 BaseT specification."

■■■ Broadcom argues that pursuant to section 5.2, to the extent Broadcom packages its products that are Broadcom Developments of Intel Deliverables, it has the right to "make, use, sell [and] market ..." those products "solely as an integral part of or incorporated to end users directly or indirectly through Broadcom's distribution channel." Because the court has determined that section 5.4, and not section 5.2, governs the scope of Broadcom's patent license, the court finds Broadcom's reliance on section 5.2 as the source of broad patent rights to be unavailing. Even if the court were to construe section 5.2 as granting a broader patent license than section 5.4 that extends to any product derived from the Intel Deliverables, the above language of section 5.2 would not give Broadcom the right to use infringing packaging technology, such as that embodied in the '410 patent, that was not among the Intel Deliverables.

Intel has met its burden of demonstrating that Broadcom's allegedly infringing products are not licensed under the '830 and '410 patents. Because the court concludes that the '830 and '410 patents are excluded from the license grant of the Joint Development Agreement, the court will grant partial summary judgment in favor of Intel on this issue.

C. *Should the Court Grant Either Parties' Motions for Summary Judgment Regarding Whether Broadcom's Accused Products Sold to General Instrument Are Licensed Under the Motorola Agreement?*

1. *The Motorola Agreement*

On June 9, 1997, Motorola, Inc. and Intel Corporation entered into a "License and Cooperation Agreement" ("the Motorola Agreement") in which they granted to each other "a non-exclusive, non-transferable license throughout the world" to certain defined licensed products, "to make, use, sell, import, offer for sale and otherwise dispose of LICENSED PRODUCTS, and to have made LICENSED PRODUCTS by another manufacturer for supply to MOTOROLA for use, import, offer for sale, sale or other disposition by MOTOROLA ...." ¶¶ 3.1, 3.2, 3.3. The term LICENSED PRODUCT is defined in section 1.5 to include one or more of the following defined terms: SEMICONDUCTOR MATERIAL, SEMICONDUCTOR STRUCTURE, SEMICONDUCTOR DIE, SEMICONDUCTOR PACKAGE, SEMICONDUCTOR DEVICE, and SEMICONDUCTOR CIRCUIT. Moreover, in the agreement, the term "LICENSED PRODUCT, when used alone, means LICENSED PRODUCT of MOTOROLA or LICENSED PRODUCT of INTEL as the case may be."

The specific license provision at issue is section 3.3, which is reproduced in full in the following paragraphs:

3.3 INTEL hereby grants to MOTOROLA for the lives of the INTEL PATENTS a non-exclusive, non-transferable license throughout the world under the INTEL PATENTS, without the right to sub-license, for MOTOROLA SEMICONDUCTOR PRODUCT SECTOR:

3.3.1 to make, use, sell, import, offer for sale and otherwise dispose of LICENSED PRODUCTS, and

3.3.2 to have made LICENSED PRODUCTS by another manufacturer for supply to MOTOROLA for use, import, offer for sale, sale of other disposition by MOTOROLA, and

3.3.3 to make, use and have made MANUFACTURING APPARATUS and to practice any process or method involved in the use thereof in furtherance of the license grants of Section 3.3.1 and 3.3.2.

The term "INTEL PATENTS" is defined in section 1.2 to mean:

all classes or type of patents and utility models, other than design patents, and applications for the aforementioned of all countries of the world, which are issued, published or filed or entitled to a priority filing date prior to the date of expiration or termination of this Agreement, which are owned by or licensed to INTEL and under which ... INTEL may have, as of the EFFECTIVE DATE of this Agreement, or may thereafter during the term of this Agreement acquire ....

The EFFECTIVE DATE of the Motorola Agreement is June 9, 1997. The duration of the agreement is 10 years.

The term "MOTOROLA SEMICONDUCTOR PRODUCT SECTOR" is defined in section 1.12 to mean:

a MOTOROLA existing business unit manufacturing and developing products falling within the definition of LICENSED PRODUCTS (as hereinafter defined), now consisting of [a set of named semiconductor groups and divisions within Motorola]. This definition of the MOTOROLA SEMI-

CONDUCTOR PRODUCTS SECTOR also includes the predecessor MOTOROLA business unit of said Groups and/or said Divisions taken singularly or in combination and any MOTOROLA future business unit acquired or derived from, by separation or merger, irrespective or appellation, said Groups and/or said Divisions taken singularly or in combination.

Under section 3.12,

MOTOROLA shall have the right to extend the release and grants of Sections 2 and 3, respectively, to any MOTOROLA SUBSIDIARY if such SUBSIDIARY assumes the same obligations as MOTOROLA hereunder (other than Section 4) as if such entity was named in place of MOTOROLA.

## 2. *The Parties' Positions*

The parties have both moved for summary judgment on this license defense. Intel has moved for summary judgment that Broadcom's products accused of infringing the asserted claims of Intel's '478, '201, and '630 patents are not licensed under the Motorola Agreement. Broadcom has cross-moved for summary judgment of noninfringement of those same patents for those accused products sold by Broadcom to General Instrument Corporation ("GI")[1], a Motorola subsidiary, based on the patent license in the Motorola Agreement. Broadcom states that sales of the following products ("the Video Chips") from Broadcom to GI are licensed pursuant to the "have made" provisions of the Motorola Agreement: BCM3033, BCM3036, BCM3037, BCM3115, BCM3116, BCM3120, BCM3137, BCM3250, BCM3300,

BCM3350, BCM3900, BCM4100, BCM4210, BCM7010, BCM7015, BCM7020, BCM7030, and BCM7031.

### a. *Intel's Position*

Intel attacks Broadcom's license defense under the Motorola Agreement on two grounds. Intel first contends that sales by Broadcom to GI cannot be licensed under the Motorola Agreement, because section 3.3 of the agreement expressly limits Motorola's rights to the Motorola Semiconductor Product Section, which is defined in section 1.12 as being limited to existing Motorola business units as of June 9, 1997. GI is not within the scope of section 3.3 because it was not an existing business unit at the time the license became effective in 1997; GI because a new sector of Motorola when it was acquired on January 5, 2000. Second, Intel argues that while Broadcom premises its Motorola license defense on "have made" rights, Motorola's "have made" rights do not extend to the purchase of chips not designed by Motorola.

### b. *Broadcom's Position*

Addressing each of Intel's bases for summary judgment in turn, Broadcom first argues that the Motorola Agreement is not restricted to then-existing business units, because section 3.12 of the agreement extends Motorola's rights under the license to all Motorola subsidiaries, including those acquired after the execution of the Motorola Agreement. Effectively, Broadcom argues that section 3.12 means that the patent license granted by Intel extends to Motorola and its subsidiaries, and is not limited to then-existing business units of Motorola. Broadcom reasons that the Motorola Agreement extends the li-

---

1. General Instrument Corporation was formerly known as "NextLevel Systems, Inc." On January 30, 1998, NextLevel Systems, Inc. changed its name to General Instrument Cor-

poration. For the sake of clarity, this opinion consistently will refer to both General Instrument Corporation and NextLevel Systems, Inc. by the shorthand abbreviation, GI.

cense terms to GI, because GI is a wholly owned subsidiary of Motorola.

With respect to the scope of the "have made" right that is granted within the Motorola Agreement, Broadcom argues that any sales to GI are licensed because Intel expressly granted to Motorola and its subsidiaries the right to "have made" by another manufacturer semiconductor material and semiconductor circuits for use, sale, or other disposition by Motorola and its subsidiaries without violating any patent issued to, or acquired by, Intel during the term of the Motorola Agreement. Thus, according to Broadcom, because GI is merely exercising its "have made" rights by purchasing the Video Chip products from Broadcom, Broadcom's manufacture and sale of Video Chips for GI cannot infringe Intel's patents.

### 3. *The Court's Decision*

In order to satisfy its burden on summary judgment, Broadcom must prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law as to both of the following legal issues: (1) whether GI is covered by the Motorola Agreement, and (2) whether the "have made" rights granted by Intel in the Motorola Agreement authorize Broadcom's manufacture and sale of Video Chips for GI. Broadcom must therefore prove that GI is covered by the Motorola Agreement *and* that the "have made" rights granted by Intel authorize Broadcom's Video Chip sales to GI. If Broadcom fails to prove that both of these legal issues must be answered in its favor as a matter of law, the court must deny its summary judgment motion.

In contrast, because Intel is seeking summary judgment that Broadcom's license defense under the Motorola Agreement fails as a matter of law, it may succeed either by proving that GI is not covered by the Motorola Agreement *or* by proving that even if GI is covered, the "have made" rights granted by Intel to GI do not authorize Broadcom's Video Chip sales to GI. Intel may thus succeed in its summary judgment motion by proving that one of the two legal issues listed above must be resolved in its favor as a matter of law.

a. *Has either party proven that no genuine issue of material fact exists as to whether GI is licensed under the Motorola Agreement?*

 As section 8.2 of the Motorola Agreement expressly provides that the agreement is governed by, and to be construed under the laws of the State of Delaware, the court applies Delaware law in interpreting the agreement. Under Delaware law, the interpretation of a patent license agreement is a question of law. *Klair,* 531 A.2d at 222.

 The principles of contract interpretation are well settled. Contracts must be construed as a whole, to give effect to the intentions of the parties. *E.I. duPont de Nemours and Co. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985). Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language of the contract its ordinary meaning. *Rhone–Poulenc Basic Chem. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. duPont,* 498 A.2d at 1113. The court will consider extrinsic evidence to interpret the agreement

only if there it finds that is ambiguity in the contract. *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del.1991).

■ Intel argues that interpreting the agreement as extending Motorola's rights to its subsidiaries, reads out the explicit limitation of the grant in section 3.3 to the MOTOROLA SEMICONDUCTOR PRODUCT SECTOR, which is limited to an enumerated set of then-existing business unit by that terms definition in section 1.12. Broadcom, however, argues that interpreting the agreement as not being extended to Motorola's subsidiaries, reads out the explicit right of section 3.12 that gives Motorola the right to extend the license grants to any MOTOROLA SUBSIDIARY, which is defined by section 1.21 to include after-acquired wholly owned subsidiaries such as GI.

The court declines to accept either of these assertions. Rather, having considered the parties' arguments and read the Motorola Agreement, the court finds that the agreement is unambiguous. There is no reason to adopt a construction that "reads out" the rights expressly granted in either section 3.3 or section 3.12. Rather, the court must interpret the agreement in a manner that gives effect to all of its provisions. The two sections can and therefore must be read consistently and in consideration of the overall purpose of the cross-license agreement.

In Section 3.7, Motorola grants to Intel "a non-exclusive, non-transferable license throughout the world under MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR PATENTS. . . ." This term is defined, in section 1.13, as the subset of patents owned by Motorola that "arise out of inventions made by one or more employees of the MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR; or which are acquired by MOTOROLA and become part of the MOTOROLA SEMI-

CONDUCTOR PRODUCTS SECTOR patent portfolio" before or during the duration of the Motorola Agreement. Thus, Motorola did not grant to Intel rights to all of its patents in section 3.7, but limited the license to the subset of patents relating to the MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR.

Throughout the Motorola Agreement, each of the license grants between Intel and Motorola are mutual. The minor image license section that grants rights from Intel to Motorola is section 3.3. Given that Motorola's patent license grant was limited to patents in the MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR, it is not surprising that the license Intel granted to Motorola in consideration of Motorola's grant in section 3.7 was also limited to the MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR.

The plain language of section 3.12 demonstrates that parties' intent to allow Motorola some flexibility regarding its ability to extend the "releases and grants of Sections 2 and 3," the Mutual Releases and Grants sections, to its subsidiaries. Intel is given the same flexibility in section 3.13, the mirror-image section of 3.12, which states that "INTEL shall have the right to extend the release and grants of Sections 2 and 3, respectively, to any INTEL SUBSIDIARY if such SUBSIDIARY assumes the same obligations as INTEL hereunder . . . as if such entity was named in the place of INTEL."

According to its plain language, Section 3.12 does not, as Broadcom argues, *automatically* extend the grants of section 3 to all Motorola subsidiaries. It is therefore incorrect that section 3.12 mandates replacing all occurrences of the name "Motorola" in the agreement with the name of its after-acquired subsidiary, "GI." Section 3.12 gives Motorola "the right to extend"

the Intel patent licenses to its subsidiary. Motorola must affirmatively exercise this right. Moreover, the Intel patent license grants may only be extended to a subsidiary "if such SUBSIDIARY assumes the same obligations as MOTOROLA hereunder ... as if such entity were named in place of MOTOROLA." Thus, under 3.12, in order for a subsidiary to obtain rights under the Motorola Agreement, that subsidiary must agree to assume the same obligations as Motorola under the Motorola Agreement. This means the license that Intel granted to Motorola with respect to its patents may only be extended to GI if GI agrees to extend to Intel a mutual license to GI's patents.

In sum, the Motorola Agreement, in sections 3.12 and 3.13, gives both parties the right to extend each other's license grants to each parties' subsidiaries. This extension is not automatic, nor is it unconditional. The contemplated quid pro quo for extending Intel's license to a Motorola subsidiary is that the subsidiary must license back its own patents to the Intel.

Instead of setting forth the necessary facts that demonstrate that GI is licensed under the terms of the Motorola Agreement, Broadcom argues in its briefs that "Section 3.12 of the Agreement extends Motorola's rights under the Agreement to any 'MOTOROLA SUBSIDIARY,' including those acquired after the execution of the Agreement ... General Instrument is a Motorola subsidiary ... As such, pursuant to Section 3.12, General Instrument is entitled to the rights conveyed by Intel to Motorola pursuant to the Agreement ...." This theory is not correct as a matter of law. GI acquires no rights under section 3.12 of the Motorola Agreement simply because it is a Motorola subsidiary.

Broadcom has not provided any documents or declarations that support the propositions that Motorola affirmatively exercised its "right to extend" its license of the Intel patents to GI, or that GI has agreed to extend to Intel a license of its own patents on the same terms as and "as if it were named in place of MOTOROLA" in the Motorola Agreement. Factual support for both of these propositions is required, if the court is to find that GI is covered by the Motorola Agreement. By simply pointing to section 3.12, Broadcom has identified a conditional right that Motorola holds. However, because Broadcom has not shown that Motorola and GI exercised their rights in accordance with section 3.12, the limitations of section 3.3 exclude GI from the license grants within the Motorola Agreement. Without such a showing, the court finds that GI was not licensed under the Motorola Agreement. Therefore, the court finds that Broadcom has failed to meet its burden of proving that it is entitled to judgment as a matter of law that its sales to GI do not infringe Intel's '478, '201, and '630 patents because such sales were covered by the Motorola Agreement. Accordingly, the court will deny Broadcom's motion.

Intel may satisfy its burden on summary judgment by demonstrating that there is an absence of evidence to support the case of the nonmoving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Intel has met this burden by demonstrating Broadcom's failure to come forward with factual support that shows that GI is covered by the Motorola Agreement. Instead of coming forward with facts that demonstrate that Motorola exercised its 3.12 right in accordance with its terms, Broadcom simply argues that because GI is a Motorola subsidiary, it is covered by section 3.12. According to the court's interpretation of the Motorola Agreement, that proposition is incorrect. The court will therefore grant summary judgment for In-

tel that Broadcom's sales to GI are not licensed under the Motorola Agreement. Because the court finds that GI is not entitled to the rights conveyed by Intel to Motorola in the Motorola Agreement, the court need not reach Intel's second independent ground for summary judgment regarding the scope of the "have made" rights granted by Intel to Motorola and whether those rights confer protections upon Broadcom.

D. *Should the Court Grant Either Parties' Motions for Summary Judgment Regarding Whether Broadcom's Accused Products Sold to Intel Licensees Are Licensed Under Intel License Agreements with Those Licensees?*

In order to buy peace in the semiconductor industry, Intel has entered into patent cross-license agreements with a number of companies. Broadcom has moved for summary judgment on the theory that "have made" rights conferred by Intel to Intel licensees in those license agreements shield Broadcom from infringement for sales made to those licensees.

1. *The Intel License Agreements*

In Intel's opening brief in support of its summary judgment motion Intel directs it arguments to a number of license agreements under which Broadcom had asserted affirmative license defenses. The agreements addressed in Intel's brief are: (i) the Intel/Sony License Agreement (1/1/93); (ii) the Intel/Sony License Agreement—3 Year Term relating to memory technology (4/9/90) ("the Intel/Sony Memory Agreement"); (iii) the Intel/NEC Patent Cross License Agreement (7/9/92); (iv) the Intel/Samsung Patent Cross License Agreement (2/8/93); (v) the Intel/Siemens Agreement (2/2/76); (vi) the Intel/Siemens Cooperation Agreement (2/2/76); (vii) the Intel/Compaq Patent Cross License Agreement (1/10/96); (viii) the Intel/Compaq Extended Industrial Standard Architecture Patent License Agreement (4/26/01) ("the Intel/Compaq EISA Agreement"); and, (ix) the Intel/Compaq PCI Agreement (2/26/93).

In Broadcom's answering brief, Broadcom clarified its position on certain of the licenses addressed by Intel. Broadcom stated that its opposition and cross-motion with regard to Broadcom sales to Sony are based on the Intel/Sony License Agreement and not on the Intel/Sony Memory Agreement. Broadcom Answering Br. at 2 n. 1. Broadcom also stated that its opposition and cross-motion with regard to Broadcom sales to Compaq are based on the Intel/Compaq Patent Cross License Agreement and are not based on the Intel/Compaq EISA Agreement or the Intel/Compaq PCI Agreement *Id.* at 2 n. 2. Finally, Broadcom stated that it does not contend that Intel granted "have made" rights to Siemens pursuant to either of the Intel/Siemens Agreements discussed in Intel's opening brief. *Id.* at 2 n. 3. Based on these concessions and because four of the above mentioned license agreements do not confer "have made" rights to the Intel licensees and the fifth (the Intel/Sony Memory Agreement) does not license the technology covered by the five patents at issue in this lawsuit, the court will grant summary judgment in favor of Intel that the Broadcom's sales to Intel licensees are not licensed under the Intel/Sony Memory Agreement, the Intel/Compaq EISA Agreement, the Intel/Compaq PCI Agreement, the Intel/Siemens Agreement, or the Intel/Siemens Cooperation Agreement.

In addition to clarifying its affirmative defenses as to the patent licenses raised in Intel's motion, Broadcom cross-moved for summary judgment on Intel's claim for patent infringement asserting that, as a

matter of law, Broadcom's manufacture and sale of certain products to Sony, NEC, Samsung, Compaq, and in addition, AT & T, Digital, Hayes, HP, Hitachi, Hyundai, Mitsubishi, and Phillips (collectively the "Licensed Customers") constitute a valid exercise of the Licensed Customers' "have made" rights, as authorized by their respective license agreements with Intel.

Broadcom contends that the sale of any products that fit within each of the License Agreements' definition of "Licensed Product" is thus licensed and noninfringing.

For clarity, the court will list the twelve license agreements that remain at issue and highlight the key terms of the license agreements at issue in the table that follows:

| Licensee | Title of License Agreement | License Grant Language | Intel Patents Included in License Grant | Term of License |
|---|---|---|---|---|
| AT & T | Patent License Agreement between AT & T and Intel (1/1/90) | "Intel grants to AT & T ... nonexclusive, royalty-free and non-transferable licenses for (i) INFORMATION HANDLING SYSTEMS<br><br>...<br><br>The licenses granted herein are licenses to (i) make, **have made**, use, lease, sell and import LICENSED PRODUCTS." | All patents, excluding design patents, owned or acquired prior to 1/1/94. | Terminated on 12/31/98 |
| Compaq | Patent Cross-license Agreement (1/10/96) | "Intel ... grants to Compaq ... a worldwide, nonexclusive, royalty-free nontransferable license ... to make, **have made for Compaq**, use, lease, sell, import, have developed for Compaq and to otherwise transfer or dispose of the Compaq Licensed Products." | All patents with effective filing date prior to 12/31/05 except design and semiconductor manufacturing process patents | Life of patents |
| Digital | Patent Cross License Agreement (5/16/98) | "Intel hereby grants to Digital ... a non-exclusive, non-transferable, royalty-free, worldwide license, without the right to sublicense, under the Intel Patents to ... **have made** Digital Licensed Products." | All patents having first effective filing date before 5/16/08. | Life of patents. |
| Hayes | Systems Patent License Agreement (1/1/94) | "Intel ... hereby grant[s] to Hayes ... a nonexclusive, worldwide, irrevocable, perpetual, royalty-free license under all of Intel's patents for the entire term thereof, to make, manufacture, use or sell Hayes Licensed Products, **to have Hayes Licensed Products made for Hayes' use or sale** ..." | All Intel patents issued or acquired as of 1/1/99 | Life of patents. |
| Hewlett Packard | Cross–License Agreement (1/10/83) | "Intel hereby grants HP an irrevocable, retroactive, nonexclusive, world-wide, royalty-free license under all patents and patent | All patents having a first effective filing date prior to 1/1/00 | Life of Patents |

| | | applications owned and controlled by INTEL having a first effective filing date prior to January 1, 2001." | | |
|---|---|---|---|---|
| Hitachi | Patent Cross License Agreement (3/10/92) | "Intel hereby grants and agrees to grant to Hitachi non-exclusive, non-transferable, royalty-free, worldwide licenses without the right to sublicense under Intel Patents to make, **to have made**, to use, and to sell ... Hitachi Licensed Products."<br><br>" 'A license to have made shall mean a license permitting the licensee to use a third party ... to make, in whole, or in part, a Licensed Product ... but such license has effect only if design and manufacturing specifications to manufacture the Licensed Product ... are provided by the licensee." | All patents pertaining to semiconductor materials, semiconductor devices, integrated circuits, or integrated circuit modules and that have a first effective filing date prior to 12/31/99 | Life of Patents |
| Hyundai | Patent Cross License Agreement (4/25/96) | "Intel ... hereby grants to Hyundai a non-exclusive, non-transferable, worldwide license, without the right to sublicense, under the Intel Patents to ... make, **have made**, use Hyundai Licensed Products." | All patents having a first effective filing date prior to 12/31/02 | Life of patents. |
| Mitsubishi | Agreement (10/16/79) | "INTEL grants and agrees to grant MITSUBISHI non-exclusive, non-transferable, royalty-free, worldwide licenses under INTEL PATENTS and INTEL PATENT APPLICATIONS to make, **to have made**, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of LICENSED PRODUCTS." | All patents having a first effective filing date prior to 10/16/89. | Life of patents. |
| NEC | Patent Cross License Agreement with NEC (7/29/92) | "INTEL hereby grants to NEC non-exclusive, non-transferable, royalty-free worldwide licenses under INTEL patents, without the right to sub-license, to make, **to have made**, to use, to import, to sell (either directly or indirectly), to lease and otherwise dispose of NEC Licensed Products ...." | All patents having a first effective filing date prior to 5/31/02. | Life of patents. |
| Phillips | Agreement (7/15/90) | "INTEL hereby grants and agrees to PHILLIPS ... a non-exclusive, indivisible, | All patents having a first effective filing date prior | Life of patents. |

| | | | | |
|---|---|---|---|---|
| | | royalty-free license under INTEL Patents ... to make, **to have made**, to use, to lease and to sell or otherwise dispose of Semiconductor Devices ...." | to 7/15/00. | |
| Samsung | Patent Cross License Agreement (2/8/93) | "INTEL hereby grants to SAMSUNG non-exclusive, non-transferable, world-wide licenses under INTEL Patents to make, **to have made**, to use, to sell (either directly or indirectly) to have developed exclusively for SAMSUNG, to lease and to otherwise dispose of SAMSUNG LICENSED PRODUCTS ...." | All patents having a first effective filing date prior to 12/31/02. | Life of patents. |
| Sony | License Agreement (4/28/94) | "Intel hereby grants to Sony non-exclusive, non-transferable, worldwide licenses, without right to sublicense, under Intel Patents to make, **to have made**, to use, to sell (directly or indirectly), to have developed exclusively for Sony to please and otherwise dispose of Sony Licensed Products." | All patents having a first effective filing date prior to 12/31/02. | Life of patents. |

Before turning to the parties' positions and the court's decision on the issue of the scope of the "have made" rights in the licenses, the court will first address some areas of disagreement with respect to which patents are covered by certain of the licenses at issue.

Both parties agree that the Intel/AT & T Patent License Agreement was terminated on December 31, 1998. Therefore, this license agreement cannot cover sales to AT & T made after that date. Regardless of the scope of the "have made" rights within, any sales to AT & T made by Broadcom on or after January 1, 1999 cannot be licensed. Intel additionally argues that the Intel/AT & T license does not cover the '830 and '410 patents because the license is limited to inventions owned or controlled during the period January 1, 1990 through January 1, 1994. This is stated in the Definitions Appendix of that agreement, which defines "Corporation's Patents" as "all patents ... owned or con-

trolled at any time during the LIMITED PERIOD by the CORPORATION." The term "LIMITED PERIOD" means "the period commencing on the effective date of this agreement and having a duration of four years." The court finds that Intel is correct. The '410 patent was filed on October 24, 1997, well after January 1, 1994. Therefore, the '410 patent is not one of the patents licensed under the Intel/AT & T Patent License Agreement. Similarly, as discussed above in section I.B.2.a., the '830 patent was not acquired by Intel until December 28, 1998. Therefore, the '830 patent is not one of the patents licensed under the Intel/AT & T Patent License Agreement. For the same reasons, the '410 and '830 patents are also not licensed under the Intel/Mitsubishi Agreement, which only includes patents with an effective filing date prior to October 16, 1989.

The court now turns to the parties' respective positions on the scope of "have made" rights.

## 2. *The Parties' Positions*
### a. *Intel's Position*

Intel contends that each of the license grants at issue expressly excludes a third party, such as Broadcom, from manufacturing or selling products not designed by the Intel licensee. Intel argues that each of the license agreements have one or both of the following similar limitations. First, "have made" rights cover only Licensee-designed products manufactured by a third party. Therefore Broadcom is only covered by the license if it was acting as a "foundry" (i.e. it was manufacturing products from designs provided by the Licensee, and not designing the products itself). *See Cyrix Corp. v. Intel Corp.*, 803 F.Supp. 1200, 1204 (E.D.Tex.1992) (*"Cyrix I "*). Foundry work, or custom manufacturing refers to arrangements in which a semi-conductor company (the foundry) makes and sells semiconductor products to its customers, the designs for which were developed or owned by the customers. *See generally*, Leonard J. Hope, The Licensed–Foundry Defense In Patent Infringement Cases: Time to Take Some of the Steam Out of Patent Exhaustion?, 11 Ga. St. U.L.Rev. 621, 628 (1995) ("Hope: Licensed Foundry Defense") (discussing how and why semiconductor companies typically out-source the manufacture of chips to foundries).

Similarly, Intel argues that its licenses are limited to "[Licensee] Products" and that each of the licenses are limited in this manner to only cover products designed by the Licensee. Under this interpretation, Intel licensees' do not have the authority to have *Broadcom* products made; they only have the authority to have *Licensee* products made. Thus Intel concludes that because Broadcom and not the licensee designed the products sold to the licensees, the Broadcom products are not licensed. *See Intel v. U.S. Intern. Trade Comm'n,* 946 F.2d 821, 828 (Fed.Cir.1991) (*"Intel Corp. v. ITC "*).

### b. *Broadcom's Position*

In response, Broadcom first contends that nothing inherent in "have made" rights requires the licensee to provide the unlicensed third party with designs. Rather, unrestricted "have made" rights provide a licensee with a right to request any third-party to manufacture a licensed good. *Cyrix Corp. v. Intel Corp.,* 77 F.3d 1381, 1386 (Fed.Cir.1996) (*"Cyrix II "*[2]). Therefore, Broadcom argues, it follows that any manufacture of a licensed good by a third-party for the licensed party cannot constitute an act of infringement by that third party. In support of its position, Broadcom points to other Intel licenses not at issue in this case that confer "have made" rights that are restricted by the further requirement that "designs, specification and working drawings for the manufacture thereof are furnished by, and originate with," the licensee. *See, e.g.,* Intel/IBM Agreement (October 1, 1989); Intel/Bull Patent Cross License Agreement (July 6, 1998); Intel/S3 Patent Cross License Agreement (December 16, 1998).[3]

---

**2.** While there are a number of Cyrix cases that have been designated Cyrix I–IV in different articles and opinions, this opinion uses the designations *Cyrix I* and *Cyrix II* to refer, respectively, to the E.D. of Texas District Court opinion and the appeal of that decision to the Federal Circuit.

**3.** Intel notes that the Intel–Hitachi Patent Cross License Agreement, that is at issue in this case, does, however, contain such a limitation on Hitachi's have made rights: "such license [to have made] has effect only if design and manufacturing specifications to manufacture the Licensed Product ... are

Broadcom also argues that Intel's reliance on *Intel Corp. v. ITC* for the proposition that the phrase "[Licensee] Products" constitutes a limitation that precludes unlicensed third-party's from manufacturing the products for the licensee is misplaced, because in analyzing other license agreements, subsequent Federal Circuit cases have held that placing the licensee company's name before the word "Products" when referring to what is licensed, is not necessarily a substantive limitation but can simply be a modifying term. *See Cyrix II*, 77 F.3d at 1384–1386 (the term "IBM Licensed Products" in the IBM–Intel agreement did not limit the products it was licensed to sell to those designed by IBM); *cf. Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1570 (Fed.Cir.1993) ("*ULSI*") (discussing *Intel Corp. v. ITC*: "In determining whether the licensing agreement provided for foundry rights, the court focused on what was meant by the "Sanyo limitation" in the agreement. The court concluded that the limitation precluded Sanyo from serving as a foundry for non-Sanyo EPROMs because Sanyo was only permitted to sell Sanyo products … In contrast, the licensing agreement between Intel and HP here contains no restriction on HP's right to sell or serve as a foundry.").

### 3. *The Court's Decision*

▉▉▉▉ The patent law defines infringement as making, using, or selling any patented invention without authority of the patent owner. 35 U.S.C. § 271(a). A patent therefore confers upon its owner a bundle of rights relating to the patented invention including the rights to exclude others from making, using, or selling the subject of the patent. Patent license

agreements allow third party licensees to have partial or complete access to the patented invention by providing immunity from an infringement suit on the licensed patent. A patent license is essentially a waiver of the patent owner's right to sue; the parties agree that the patent owner will allow the licensee either to make, to use, to sell (or some combination of, or derivative of, these three rights) without subjecting the licensee to an infringement suit. It is thus well settled that a valid license is a complete defense to infringement. *Unidisco, Inc. v. Schattner*, 824 F.2d 965, 968 (Fed.Cir.1987) (resale of a patented product is not infringing when it was purchased from a party licensed to sell the products); *Lisle Corp. v. Edwards*, 777 F.2d 693, 695 (Fed.Cir.1985) (sale by authorized licensee to a third party bars a finding of infringement against the licensee and the third party)

▉▉▉ A "have made" right, which is a right carved from the term "to make" in 35 U.S.C. § 271(a), provides a licensee with the right to request an unlicensed third-party to manufacture a licensed good for the licensee. *See Cyrix II*, 77 F.3d at 1386. The key issues in this dispute by the parties relate to the mechanics of how a "have made" right is exercised and the scope of its coverage. That is, (i) did the Intel licensees' exercise their "have made" rights by purchasing allegedly infringing products from Broadcom?, and if so (ii) does the fact that Broadcom sold allegedly infringing products to Intel licensees insulate Broadcom from liability for infringement based on those sales?

Because the parties seek to draw support from Federal Circuit cases involving some combination of license defenses, foundry rights, and "have made" rights,

provided by the licensee." It is true, however, that none of the other "have made" rights

at issue contain any such limitation.

the court will begin by reviewing the facts and holdings of those cases.

### a. *Review of pertinent case law; license defenses*

The intersection of cross-licenses and foundry agreements to create viable implied license defenses for unlicensed third parties have been the subject of a number of judicial opinions and of considerable scholarly debate in the past decade. *See Cyrix II*, 77 F.3d 1381 (addressing separate license defenses of Cyrix with respect to the Intel/IBM agreement and the Intel/Mostek agreement); *Cyrix I*, 803 F.Supp. 1200; *ULSI*, 995 F.2d 1566; *Intel Corp. v. ITC*, 946 F.2d 821; *see also* David K. Barr, Recent Federal Court Decisions on Interpretation of Agreements Relating to Patents, 477 PLI/Pat. 1085, 1092–1099 (1997); Hope: Licensed Foundry Defense, 11 Ga. St. U.L.Rev. 621.

There are two well-understood factual circumstances where unlicensed parties can attain rights that shield their actions from infringement based on the third parties' interaction with a licensee. First, the unlicensed third party can give its designs to a licensee and ask that licensee to use its rights "to make" and "to sell" under its license to manufacture the product for the third party (i.e. to act as a foundry for the unlicensed third party), who then resells that product to its customers. The Federal Circuit has held that because the products were made and sold by a licensed party, the licensor/patent owner cannot sue the third party for infringement. *See Cyrix II*, 77 F.3d at 1387; *ULSI*, 995 F.2d at 1570. Second, a licensed party that has the right to "have [products] made," can exercise that right by requesting an unlicensed third party to make and sell products for it, which the licensee either uses or ultimately sells to its customers. *See Cyrix II*, 77 F.3d at 1387–88. Under that arrangement, to the extent the unlicensed party makes products for the licensee, the licensor/patent owner cannot sue the unlicensed party for patent infringement.

#### (i) *The Intel Foundry Cases*

The foundry cases arise under similar sets of facts and relationships between the parties, which Judge Plager summarized in his dissenting opinion in *ULSI*, as follows:

> Company A and Company B are major competitors . . . . A and B both maintain large [research] & [development] operations, and obtain patents on their various inventions . . . [B]oth companies . . . agree that it is in their mutual interest to avoid spending resources litigating with each other over patent rights rather than inventing . . . . [Therefore,] they cross-license each other in such a way that each is free to innovate and market their own similar products, without fear of infringing upon the patent rights of the other . . .

> Company C, a small company seeking to break in to the same market [as A and B], approaches Company B with a proposition. C will provide B with details of its (C's) invention (a design similar to that patented by A). C will provide complete . . . specifications, and warrants to B in writing that C rightfully obtained the design involved and that it does not infringe the patent rights of others. Using its manufacturing facilities, B is to manufacture the item to C's specifications. B will provide the raw materials, and will be paid on a per completed unit basis. B agrees, and . . . delivers the item to C . . .

> Later, C markets its product . . . A examines C's product, concludes that it is so much like A's product that it infringes one of A's patents, and sues C. C then defends on the grounds, that since B manufactured the item that infringes A's patent, and since B is immune from liability for infringement of A's patents

under the A–B cross-license, C also is immune under the doctrine of ... 'patent exhaustion.'

*ULSI,* 995 F.2d at 1571 (Plager, J. Dissent). Such was the scenario in *Intel Corp. v. ITC, Cyrix I, Cyrix II,* and *ULSI.*

In *Intel Corp. v. ITC,* Intel and Sanyo entered into a broad patent cross-licensing agreement. *Intel Corp. v. ITC,* 946 F.2d at 826. Subsequently, Sanyo acted as a foundry for Atmel Corp. *Id.* Sanyo manufactured Erasable Programmable Read–Only Memories (EPROMs) for Atmel Corp. to sell as Atmel's own product, which were designed by Atmel Corp. but allegedly infringed Intel's patents. *Id.* Intel initiated a patent infringement action against Atmel. In response Atmel argued that its EPROMs were noninfringing because they were manufactured by Sanyo under the broad cross-license agreement between Intel and Sanyo. *Id.* Essentially this defense was grounded in the patent law doctrine of 'patent exhaustion' (also called the 'first sale doctrine') which states that:

> [W]hen the patentee ... sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use. The article ... passes without the limit of the monopoly.

*Adams v. Burke,* 17 Wall. 453, 84 U.S. 453, 456, 21 L.Ed. 700 (1873); *see also Bloomer v. McQuewan,* 55 U.S. (14 How.) 539, 549, 14 L.Ed. 532 (1852). The rationale underlying the doctrine as applied to licenses is that once the patentee has received consideration for releasing the article from the monopoly, by virtue of the license agreement, he can no longer limit or charge for its use. *See U.S. v. Univis Lens Co.,* 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942) (a patent owners monopoly ends with the first sale or disposition by a patentee, or his licensee acting within the

scope of the license, or an article embodying the invention of the patent).

In *Intel Corp. v. ITC,* the Federal Circuit declined to accept Atmel's argument. Rather, it based its decision on its interpretation of the language of the Intel–Sanyo cross-license agreement. The court interpreted the agreement to mean that Intel licensed only *Sanyo* products. Based on this 'Sanyo limitation,' because Sanyo manufactured Atmel-designed EPROMs for Atmel Corp., the court held that the EPROMs were beyond the scope of the Intel–Sanyo license. The court held that, based on the language in the license, Intel could not have possibly intended that any company in the world could get an Intel licensee like Sanyo to manufacture its infringing parts without having to get its own license from Intel. *Intel Corp. v. ITC,* 946 F.2d at 827–28.

While the structural relationship was the same in *Cyrix* and *ULSI,* the license agreements at issue were interpreted not to have such 'Sanyo limitations.' Therefore, in those two cases, the Federal Circuit held, based on a straightforward application of the doctrine of patent exhaustion, that the Intel licensees (SGS–Thompson and HP, respectively) were allowed to act as foundries for unlicensed third parties (Cyrix and ULSI) and that because the products were manufactured by licensees, the unlicensed third parties could not be liable for patent infringement. *See Cyrix II,* 77 F.3d at 1386 (affirming district court's finding that the definition of "IBM Licensed Products" in IBM–Intel agreement did not limit the products it was licensed to sell to those designed by IBM and finding that because IBM therefore had a right to act as a foundry for Cyrix, Intel's rights with respect to Cyrix were exhausted); *Cyrix I,* 803 F.Supp. at 1213–15 (finding that because Intel licensee, ST sold the finished products it manufactured

for Cyrix to Cyrix, Intel's rights with respect to Cyrix are exhausted); *ULSI*, 995 F.2d at 1569–71 (finding that patent exhaustion applied to bar Intel's suit against ULSI by Intel licensee HP's manufacture and sale of the allegedly infringing to ULSI as per foundry agreement between HP and ULSI). In sum, because the Intel licensees were validly exercising their Intel-granted rights "to make" and "to sell," once those products were "sold" from the licensee/foundry to the third party, the doctrine of patent exhaustion precluded Intel from suing the third party for infringement based on the third party's subsequent sale of the product to its customers.

While this case presents a different structural relationship between the licensed and unlicensed parties and a different type of transaction than the Intel foundry cases, both parties analogize to different foundry cases to support their arguments regarding the presence or lack of contractual limitations. Intel argues that the license agreements contain limiting "Sanyo-type limitations," citing *Intel v. ITC*, while Broadcom argues that they do not, citing *Cyrix II* and *ULSI*.

### (ii) *"Have made" rights*

While none of the licenses at issue granted to the licensee the right to sublicense its rights to a third party and in fact are restricted in that regard, it is well settled that rights to a third party can nonetheless be conferred through the valid exercise of a licensee's "have made rights." *See Southwire Co. v. United States Int. Trade Comm.*, 67 C.C.P.A. 141, 629 F.2d 1332, 1339 (1980) (quoting *Carey v. United States*, 164 Ct.Cl. 304, 326 F.2d 975, 979–80 (1964) ("have made" rights are distinguishable from rights to sublicense: if "production is ... for the use of the original licensee," it is an exercise of a have made right, but if the production is for the unli-

censed third party itself, it is a sublicense)). "Have made" rights stem from the basic rights to make, use, and sell that are typically granted in a patent license. "The [have-made] license permits [the licensee] to engage others to do all the work connected with the production of the [licensed] article for him." *Carey*, 326 F.2d at 979.

Thus, while the foundry cases described above implicate the patent exhaustion doctrine because the first sale is made by the licensee to the unlicensed party, in "have made" cases the first sale is not by a licensee, but to a licensee. The issue is whether the scope of the "have made" license immunizes those sales from being infringing sales.

In another portion of the *Cyrix II* opinion, the Federal Circuit addressed this license defense issue and construed the effect of "have made" rights. In addition to the two party foundry arrangement between IBM and Cyrix, *Cyrix II* also involved a three-way foundry arrangement involving Cyrix, SGS–Thomson ("ST"), and a foreign subsidiary of SGS–Thomson, known as ST–Italy. While the right of SGS–Thompson to act as a foundry for Cyrix had been resolved by the Intel foundry cases, in this arrangement, ST subcontracted the manufacture of a portion of Cyrix's microprocessors to an unlicensed manufacturer, ST–Italy. ST argued that this was a valid exercise of its "have made" and "sell" rights under its license with Intel. ST exercised that right by asking ST–Italy to make products, which it sold back to ST and ST ultimately sold to Cyrix. Intel, in response, argued that the transaction was in effect a sublicense which violated the license's prohibition against sublicensing because the licensee, ST, was a mere "pass-through": ST–Italy was in reality producing the microprocessors for Cyrix and not for ST. *See*

*E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* 498 A.2d 1108 (Del.1985) (holding that in "sham" transaction where sales merely passed through licensee; licensee exceeded "have made" rights).

The Federal Circuit disagreed with Intel and found that the transaction between ST and ST–Italy was a proper exercise of ST's "have made" rights. More specifically, the court stated that:

> the third party (ST–Italy) properly manufactured microprocessors under ST's 'have made' rights, and ST then properly sold the products to a different entity, Cyrix. The two agreements, one permitting ST–Italy to manufacture microprocessors for ST and the other providing for ST's sale of microprocessors to Cyrix, were separate business transactions ... We accordingly conclude that the district court did not err in holding that the arrangements among ST, ST–Italy, and Cyrix were a valid exercise of ST's "have made" rights under its agreement with Intel.

*Cyrix II,* 77 F.3d at 1387–88.

### (iii) *summary foundry rights and "have made" rights*

In sum, the foundry cases stand for the proposition that unless the licensor contractually limits the licensees' rights, by exercising their rights to "make" and "sell" licensed products, licensees can shield an unlicensed reseller from infringement liability. In each of those cases, the unlicensed reseller was shielded from liability because they purchased the allegedly infringing product from the licensee, under the doctrine of patent exhaustion. The "have made" cases stand for the separate proposition that by exercising their rights to "have [licensed products] made," licensees can shield the unlicensed manufacturer who makes the products for them and subsequently sells the products to the them from infringement liability by impliedly licensing the otherwise infringing actions.

### b. *Is Broadcom insulated from liability for sales to Intel Licensees that have the right to "have [licensed products] made" by a third party?*

■ In the present case, Broadcom is an unlicensed third party that makes allegedly infringing products. As a partial defense to Intel's patent infringement allegations, Broadcom argues that to the extent it sells those infringing products to an Intel licensee, its actions fall under the umbrella of that licensee's "have made" rights, and Broadcom is therefore shielded from infringement liability for its actions.

The only case cited by the parties that discusses a transaction that is somewhat structurally analogous to the present transaction is *Cyrix II,* which analyzes the above described arrangement between ST and ST Italy. According to the holding of that case, ST validly exercised its have made rights by requesting ST–Italy, an unlicensed party, to make licensed products for it. Although ST Italy's liability was not at issue in that case, it is apparent from the *Cyrix II* holding that ST Italy would have no patent infringement liability for its actions of making and selling allegedly infringing products to ST. This is because ST's exercise of its "have made" right gave rise to an implied license that shielded ST–Italy from infringement.

Broadcom argues that it, like ST Italy, is an unlicensed third party that makes licensed products for Intel licensees. Broadcom claims that it cannot be liable for infringement for the acts of making and selling for sales of licensed products to Intel licensees, because it sells accused products to Intel licensees with "have made" rights. The issue here is what protection, if any, is afforded to Broadcom by virtue of selling to Intel licensees'

whose licenses with Intel contain "have made" rights.

■ Unlicensed third party manufacturers can be immunized in this fashion where their otherwise infringing actions were performed pursuant to the exercise of a licensee's "have made" right. However, it is not clear that Broadcom's actions in this case were conducted under the licenses. An unlicensed third party in the position of Broadcom only is afforded the protections of a license if those protections are conveyed by the licensee to the third party as an exercise of the licensed party's "have made" rights. Broadcom cannot lay claim to those protections if they were never conveyed to Broadcom.

For example, assume that a licensor grants to a licensee the rights to "make, use, sell, and have made" certain licensed products. The effect of the license is to prevent the licensor from suing the licensee for infringement for making, using, selling, or having made the covered products. The unfettered "have made" right gives the licensee the right to designate a third party to make the product for it. Thus, when exercised, the "have made" right passes on certain protections to the third party. That third party's actions in making the product and selling the product back to the licensee become impliedly licensed.

Based on the facts thus far presented, Broadcom's actions are different from the preceding example because it is unclear whether Broadcom *made* the products pursuant to a request from the licensee, in which case the making and selling would be authorized to the extent that licensee's license allows it to be, or whether Broadcom simply *sold* allegedly infringing off-the-shelf products to parties that happen to be Intel licensees. The ST–ST Italy transaction in *Cyrix II* is an example of the former case. In the latter case, how-

ever, the Intel licensees cannot be said to be exercising their "have made" rights, because they are not taking protections that they have under the license and conveying them to Broadcom. Rather, when Broadcom makes an allegedly infringing product, that act itself constitutes an act of potential infringement. Subsequent sales of such off-the-shelf products to licensees do not convert that act of infringement into noninfringement.

This court came to the same conclusion when it previously addressed the issue of whether "have made" rights confer protections to manufacturers of "off-the-shelf" parts in *Thorn EMI North America, Inc. v. Hyundai Elec. Indus. Co.*, CA 94–332–RRM, 1996 U.S. Dist. LEXIS 21170 (D.Del. July 12, 1996). There, this court found that "a foundry commissioned by IBM to manufacture IHS products would have the protection of the licensed agreement ... [but that] a manufacturer of 'off the shelf' products is not a foundry ... [and] therefore, whether or not it sold the products to IBM, would not be protected by the agreement." *Thorn EMI*. 1996 U.S. Dist. LEXIS 21170 at * 15.

■ The Intel licensees have the right to "have [products] made." This right, which is derived from the language of the patent infringement statute, supplements the licensee's right "to make" products for itself, by allowing the licensee to request a third party to make the product for it. The implied right to grant to the otherwise unlicensed third party the right "to make" and "to sell" the product for the licensed party (i.e. to act as a foundry) is an intrinsic part of that licensees "have made" right. Intel's granting of "have made" rights to licensees does not, however, give the licensee the inherent right to in some way immunize prior acts of infringement through its subsequent purchase of off-the-shelf goods. To the extent that the "have

made" right allows the licensee to purchase the licensed products off of the shelf of an unlicensed third party, that right may shield the licensee from subsequent liability for using or selling that product. However, the "have made" right in that situation does not immunize the unlicensed third party.

The legal effect of licensees exercising their "have made" rights by commissioning a third party to make licensed products is very different from the legal effect of licensees purchasing allegedly infringing products from a third party. In the first situation, the third party's acts are noninfringing (if the "have made" rights conveyed to the licensee are unrestricted), because there is a flow of rights that authorizes the unlicensed party's otherwise infringing acts (i.e. making, selling, or using the patented invention). These rights flow from Intel to the licensees and down to the third party manufacturer before the third party engages in any of those otherwise infringing acts. Without an agreement between each Intel licensee and Broadcom demonstrating that the products were made, pursuant to rights that flowed from the licensee to Broadcom, Broadcom's sales to the Intel licensees cannot be said to be non-infringing. Based on the facts thus far provided, no such rights flow to Broadcom in this set of sale transactions. Broadcom cannot unilaterally rely on the rights of the licensees who purchase its products, when none of those licensees' rights have been conferred onto Broadcom.

Both parties' briefs focus on the scope of the rights that Intel granted to its licensees in the twelve license agreements at issue. Focusing on the agreements, the parties dispute whether the "have made" rights contain limitations that require the licensees to provide designs to unlicensed manufacturers that they ask to make the products and whether the products that the licensee may "have made" are limited to exclude products made by Broadcom. Determining whether Broadcom's sales to the licensees are licensed requires a two part inquiry; before the scope of the rights granted by Intel to its licensees become relevant, the court must first determine whether the licensees granted any of their rights to Broadcom. Because there is no discussion of evidence or lack of evidence of agreements between the licensees and Broadcom that demonstrates that the licensees' exercised their right to ask Broadcom to make a licensed product for them, the court need not reach the disputed issues of contract interpretation relating to the license agreements in denying each parties request for summary judgment.

The court finds that neither Intel or Broadcom has satisfied its burden in demonstrating that no genuine issues of material facts exist as to this license defense. Neither party presented facts or pointed to the absence of facts relating to whether Broadcom's production of the allegedly infringing products was done under the cover of an Intel licensee's exercise of its "have made" rights. Without knowing whether facts relating to this threshold issue exist, it would be improper for the court to grant summary judgment. Therefore the court will deny both Intel and Broadcom's motions.

## II. CONCLUSION

With respect to Intel's motion for partial summary judgment that Broadcom is not licensed under the '830 and '410 patents under license grants of the Intel–Broadcom Joint Development Agreement, the court finds that the '830 and '410 patents are excluded from the coverage of that agreement. Accordingly, the court will grant Intel's motion.

With respect to the parties' cross-motions for partial summary judgment with respect to whether Broadcom's sales to General Instrument Corporation are licensed under the Motorola Agreement, the court finds that General Instrument Corporation is not a licensee under the Motorola Agreement, and therefore grants summary judgment in favor of Intel.

As to the parties' cross-motions for partial summary judgment with respect to whether Broadcom's sales to various Intel licensees are licensed under Intel license agreements, the court finds that genuine issues of material fact remain as to whether the sale transactions to Intel licensees conveyed any of those licensees' rights to Broadcom. Accordingly, the court will deny both parties' summary judgment motions. Should Broadcom be unable, at trial or through documents submitted with post-trial briefing, to set forth any such facts, this license defense will be without legal merit. However, should Broadcom set forth facts that indicate that Broadcom was indeed making these allegedly infringing products in response to requests by Intel licensees "to make" them, Broadcom may pursue this defense.

Regardless of the ultimate scope of protections, if any, afforded by the "have made" rights the court makes the following findings as a matter of law: (i) The Intel/AT & T Patent License Agreement cannot cover any sales made after its termination date of December 31, 1998; (ii) the Intel/AT & T Patent License Agreement does not license the '830 or '410 patents; (iii) the Intel/Mitsubishi Agreement does not license the '830 or '410 patents. Additionally, the court makes no findings at this time as to whether certain Broadcom products sold to the Intel licensees constitute "Licensed Products" under the individual Intel-licensee agreements.

The court will enter an order in accordance with this memorandum opinion.